**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

JEFFREY APPLEMAN, CPA,

                    Plaintiff,

    - against -

Case No.: 2-2:25-cv-05593
(JMW)

CALLAN JMB INC., COLDCHAIN TECHNOLOGY
SERVICES, LLC, and WAYNE WILLIAMS, in his
individual and professional capacities,

                    Defendants.

-----------------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
### DEFENDANTS' MOTION TO PARTIALLY DISMISS THE COMPLAINT

**SARVER LAW FIRM, PLLC**

By:    *Eric M. Sarver Esq*

Eric M. Sarver, Esq. (ES-4454)
*Attorneys for Plaintiff*
Sarver Law Firm, PLLC
106 West 32nd Street, Suite 147
New York, New York 10001
Tel: (917) 930-8684
Fax: (212) 409-8529
Email: ems@sarverlawfirm.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................i

TABLE OF AUTHORITIES .......................................................................... ii

BACKGROUND FACTS.................................................................................1

ARGUMENT....................................................................................................4

    A.  <u>FRCP 12(b)(6) Standard</u> ...............................................................4

    B.  <u>New York Law Governs Plaintiff's Tort Causes Of Action</u>.............5

    **I.**    **Defendants' Breaches Stem Not From Terminating The Agreement But From Unlawfully Terminating Plaintiff's Employment "For Cause" And In Violation Of The Agreement, Section 5** ....................7

    **II.**   **Defendants' Statement That Plaintiff Was Fired "For Cause" Constitutes Libel *Per Se*, And Is Inappropriate On A Motion To Dismiss For Failure To State A Cause Of Action** ......................................11

    A.  <u>Defendants' Publication That Plaintiff Was Terminated "For Cause" Is Susceptible Of A Defamatory Meaning And Libelous *Per Se*</u> ............11

    B.  <u>Defendants' Defamatory Statement Is Not Protected By Qualified Immunity</u> ................15

    **III.**  **Plaintiff Has Sufficiently Alleged A Cause Of Action For Defendants' Tortious Interference With Prospective Business Relations** .................18

    **IV.**  **The Confidentiality Requirement, Section 29 Of The Agreement, Expressly Applies To, And Was Breached By, The Defendants**............................................20

    **V.**   **Plaintiff's Negligent Infliction Of Emotional Distress Claim Arises Out of Conduct Separate and Apart From the Agreement**.............................................21

    **VI.**  **Plaintiff Sufficiently Pleads Coldchain's Liability On Grounds That Coldchain Acted As Plaintiff's Joint Employer; Acted As Callan's Alter Ego And / Or Agent; And Manifested An Intent To Be Bound By The Agreement** .......................................22

CONCLUSION................................................................................................25

*ABB, Inc. v Havtech, LLC,*
2019 NY slip op 30095 ............................................................................................6

*Abedine v Lord Sec. Corp.,*
2017 NY Slip Op 30511 ..........................................................................................11

*Amaranth LLC v J.P. Morgan Chase & Co.,*
71 A.D.3d 40 (1st Dept. 2009) ...............................................................................19

*Ashcroft v Iqbal,*
556 U.S. 662 (2009)..................................................................................................5

*Bell Atlantic Corp. v Twombly,*
550 U.S. 544 (2007).............................................................................................4, 15

*Bentley v Bunton,*
94 S.W.3d 561, 591 (Tex.2002) .............................................................................17

*Bergman v Oshman's Sporting Goods, Inc.,*
550 U.S. 544 (2007)................................................................................................17

*Brian v Richardson,*
87 NY2d 46 (N.Y. 1995) .....................................................................................12, 14

*Carney v Mem'l Hosp. & Nursing Home of Greene County,*
64 N.Y.2d 770 (1985).............................................................................11, 12, 13,14

*Carr v. Brasher,*
776 S.W.2d 567 (Tex.1989) ...................................................................................17

*Carvel Corp. v Noonan,*
3 NY3d 182 (2004)..................................................................................................18

*Casso v Brand,*
776 S.W.2d 551 (1929)...........................................................................................17

*Chico Auto Parts & Servs v Crockett,*
512 S.W.3d 560 (8th Dist. 2017).............................................................................25

*Clinton's Ditch Co-op Co., Inc. v NLRB,*
778 F.2d 132 (2d Cir. 1985) ...................................................................................23

*CNOOC Southeast Asia v Paladin Resources,*
222 S.W.3d 889 (Tex. Ct. Appl. 5th Dist. 2007).......................................................24

*Cooney v Osgood Mach., Inc.*,
81 N.Y.2d 66 (1993). .......................................................................................7

*Corrosion Prevention Techs. LLC v Hatle*,
No. 4:20-CV-2201, 2020 WL 6202690 (S.D. Tex. Oct. 22, 2020) ...........................19

*Cruz v Robert Abbey, Inc.*,
778 F.Supp. 605 (E.D.N.Y. 1991) ...........................................................................23

*DeSilva v North Shore long Is. Jewish Health Sys.*,
770 F.Supp.2d 497, 506 (E.D.N.Y. 2011) ...............................................................4

*Discover Grp, Inc. v. Lexmark Intern., Inc.*,
333 F.Supp.2d 78 (E.D.N.Y. 2004) ......................................................................5, 6

*E.C. Contracting, Inc. v D.F. Pray, Inc.*,
No. 19-CV-6813 2022 (E.D.N.Y. Jan 12, 2022) .......................................................23

*Finance One Public Co. Ltd. v Lehman Bros. Spec. Financing Inc*,
414 F.3d 325 (2d Cir. 2005). ...............................................................................6, 7

*Gama Aviation Inc. v Sandton Capital Partners, LP*,
2013 NY Slip Op 32648 .......................................................................................18

*Gardner v Sensio Inc.*,
645 F.Supp.3d 310 (S.D.N.Y. 2022) ......................................................................23

*Gulf Liquids New River Project, LLC v Gulsby Eng'g, Inc.*,
356 S.W.3d 54 (Tex. App. 2011).............................................................................9

*Hughes v LaSalle Bank*,
419 F.Supp.2d 605 (S.D.N.Y. 2006) ........................................................................6

*I love Omni, LLC v Omnitrition Int'l, Inc.*,
No. 3:16-CV-2410-G, 2017 WL 3086035 (ND Tex. July 20, 2017) ...........................19

*Impulse Marketing Grp. Inc. v Nat'l Small Bus. All., Inc.*,
No. 05-CV-7776, 2007 WL 1701813 (S.D.N.Y. June 12, 2007) .................................23

*In re Cavalry Const.*,
425 F.Appr'x 70 (2d Cir. 2011)...............................................................................23

*In re Merrill Lynch & Co., Inc.*,
273 F.Supp.2d 351 (S.D.N.Y. 2003) ............................................................4, 5, 13, 24

*Int'l Audiotext Network, Inc. v Am. Tel. and Tel. Co.*
62 F.3d 69 (2d Cir. 1995) ............................................................. 10, 20, 21

*Izaguirre v Aguilar,*
No. 13-19-00225-CV, 2021 WL 727017 (Tex. App. Feb. 25, 2021)............................12

*James v Gannett Co.,*
40 N.Y.2d 415 (1976)............................................................................................12

*Jennings v Hunt Companies, Inc.,*
367 F.Supp.3d 66 (S.D.N.Y. 2019) .......................................................................23

*Kamchi v Weissman,*
125 A.D.3d 142 (2d Dept. 2014) .....................................................................15, 16

*Kellog Brown & Root, Inc.,*
166 S.W.3d 732 (Tex. 2005) ...................................................................................24

*Knieriemen v Bache Halsey Stuart Shields Inc.,*
74 A.D.2d 290 (1st Dept.1993) .................................................................................6

*Law Offices of Ira H. Leibowitz v Landmark Ventures, Inc.,*
131 A.D.3d 583 (2d Dept 2015) .............................................................................18

*Leblanc v Bedrock Petroleum Consultants, LLC.,*
No. CV H-20-3476, 2021 WL 3884265 (S.D. Tex. Jun 3, 2021).............................10

*Lennar Homes of Texas Land v Whiteley,*
625 S.W.3d 569 (Tex. Ct. App. 2021).....................................................................24

*Levitt v Bear Stearns & Co.,*
340 F.3d 94 (2d Cir. 2003) ........................................................................................5

*Leyendecker & Assoc., Inc. v Wechter,*
683 S.W.2d 369, 375 (Tex. 1984) ...........................................................................25

*Liberman v Gelstein,*
80 N.Y.2d 429 (1992)..............................................................................................15

*Maryland Cas. Co. v. Cont'l Cas. Co.,*
332 F.3d 145 (2d Cir. 2003) ......................................................................................5

*Melia v Zenhire, Inc,*
2013 NY Slip Op 52254 .............................................................................................6

*November v Time Inc,*
13 N.Y.2d 175 (1963)..............................................................................................12

*NY Univ. v Cont'l Ins. Co. et al.,*
87 N.Y.2d 308 (1995)..............................................................................................25

iv

*Pacific Carlton Dev. Corp. v 752 Pacific, LLC,*
62 A.D.3d 677 (2d Dept. 2009) ................................................................................23

*Payne v Enable Software Inc.,*
229 A.D.2d 880 (1996) ............................................................................................10

*Pureshield, Inc. v Allied Bioscience, Inc.,*
No. 4:20-CV-734-SDJ, 2021 WL 4492861 (E.D. Tex. Sept. 30, 2021) ......................19

*Rinaldi v Holt, Rinehart,*
46 Misc.2d 567 (1965) ............................................................................................11

*S. Union Co. v City of Edinburg,*
129 S.W.3d 74 (Tex. 2003) ......................................................................................24

*St. John's Univ., NY v Bolton,*
757 F.Supp.2d 144 (E.D.N.Y. 2010) ...............................................................4, 15, 20

*Villager Pond, Inc. v Town of Darien,*
56 F.3d 375 (2d Cir. 1995) ........................................................................................5

*Winter-Wolff Intern. v. Alcan Packaging Food,*
499 F.Supp.2d 233 (E.D.N.Y. 2007) ....................................................................5, 6, 7

**Rules**

Fed. R Civ. P. §12 ..............................................................................................*passim*

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO PARTIALLY DISMISS THE COMPLAINT**

Plaintiff, Jeffrey Appleman, CPA, by and through his attorneys, Sarver Law Firm, PLLC, respectfully submits this memorandum of law in opposition to Defendants' motion to partially dismiss the Complaint pursuant to FRCP 12(b)(6). Accepting Plaintiff's facts as true, and drawing all reasonable inferences in his favor, the pleadings and relevant case law demonstrate that Plaintiff's claims are sufficient to survive Defendants' motion to dismiss.

**BACKGROUND FACTS**

Plaintiff began working with Defendants, first as a 1099, outsourced fractional Chief Financial Officer ("CFO") for Defendant Callan JMB Inc, starting in January, 2024, and then as a full-time W-2 employee, pursuant to an employment agreement dated October 1, 2024, (the "Agreement"), as a full time CFO from February 6, 2025, through May 13, 2025. On October 24, 2024, the Agreement was amended (the "Amendment") to, *inter alia*, revise Section 4(a) to provide base salary increases to $220,000 from the first day of the Initial Term through December 31, 2025, with compensation increasing to $250,000 on January 1, 2026, and $280,000 starting on January 1, 2027. *See Comp. Par*. 13. Plaintiff's equity award would have also increased to 100,000 stock options (instead of 50,000) on the first day of an Initial Public Offering of Callan, vesting quarterly per a schedule set forth. Notably, the Amendment Section 4(c) reads:

> "Equity Awards. During the Term, the Executive shall be entitled to receive equity awards either now or in the future . . . In addition, on the 1st day of the Initial Public Offering of the Company, the Executive shall be awarded an additional 100,000 stock options (the "Options") with an exercise price equal to the price of the Company's common stock as set forth in the final Registration Statement for the Offering, vesting quarterly (every 3 months) over twenty-four (24) months with the first installment vesting three (3) months after the closing of the Company's currently contemplated firm commitment underwritten public offering (the "Offering") . . . ."

> *See Complaint, Par. 15, and Par. 60.*

During Plaintiff's tenure and under his guidance, Defendant Callan successfully completed an initial public offering (the IPO) and passed independent audits. Plaintiff diligently performed his job duties, including leading Callan's finance, accounting, audit readiness, and public company transition workstreams and other tasks and executive functions as the company's CFO. On February 5, 2025, Callan provided Plaintiff a Notice of Stock Option Grant, granting Plaintiff an option to purchase 15,000 shares at $4.00 per share, immediately vested, with a 10-year (ten-year) term. Callan successfully went public in February, 2025. *Comp. Par. 18.*

Notwithstanding Plaintiff's successful role in helping Callan reach its IPO goals, on May 13, 2025 — three months after using Plaintiff to successfully get Callan to go public — Defendants abruptly terminated Plaintiff's employment "For Cause," alleging in a Termination Letter that Mr. Appleman engaged in willful misconduct, gross negligence, or other conditions to satisfy a For Cause termination. Specifically, Defendants' Termination Letter cited (a) purported migrations and subledgers *pre-dating Plaintiff's full-time CFO role;* (b) billing and AR processes controlled by personnel who did not report to Plaintiff; (c) the absence of an inventory management module integrated with QuickBooks; and (d) intercompany process documentation, as alleged grounds for Plaintiff's for Cause termination. However, these purported "performance issues" were, in actuality, legacy or known pre-existing issues that pre-dated Plaintiff's employment or consulting work. They were further outside of Plaintiff's control, authority, and reporting chain, and were the subject of Plaintiff's documented recommendations to senior leadership, including presentations in February, 2025, identifying corrective actions and resource needs — yet, Defendants, their senior-level management, and Callan's CEO, Wayne Williams ("Williams") ignored Plaintiff's recommendations for corrective actions. *Comp. Par. 20.*

Upon termination, Defendants: (i) failed to pay Plaintiff his earned 2024 bonus under Section 4(b) of the Agreement, payable year-end when certified by the Board; (ii) failed to pay Plaintiff his pro-rata 2025 bonus, per Section 5(d)(i)(3) of the Agreement if Plaintiff's termination did not meet the conditions described as "For Cause"; (iii) failed to provide other compensation and benefits due Plaintiff

upon termination other than For Cause, including reimbursement for vacation days, PTO, and expenses; and (iv) failed to provide Plaintiff with outplacement services, as contractually promised.

Section 5(c) of the Agreement states that:

> [Callan] may terminate [Plaintiff's] employment hereunder for Cause . . . at any time upon notice to [Plaintiff] setting forth in reasonable detail the nature of such Cause. Upon the giving of notice of termination of [Plaintiff's] employment . . . [Plaintiff] will receive [Plaintiff's] Final Compensation. Except as provided herein, [Callan] will have no further obligation to [Plaintiff] upon termination of [Plaintiff's] employment. Notably, Section 11(c) of the Agreement defines Cause, as applicable here, as an executive's, "(i) . . . continued refusal or failure to perform . . . material duties and responsibilities to Company if such refusal or failure is not cured within thirty (30) days following written notice of such refusal or failure . . .; [or] (ii) willful, grossly negligent or unlawful misconduct by Executive which causes material harm to Company or its reputation . . .

> *See Complaint Exhibit A, Sections 5(c) and 11(c).*

The Agreement also provides for termination other than for Cause, and in such case, an executive would receive the following: (1) severance; (2) payment of bonus, per Section 4(b), if termination occurs after the end of a calendar year; and (3) payment of a *pro-rata* portion of Plaintiff's Bonus for the year in which termination occurs that would have otherwise been payable. *See Complaint Exhibit A; Agreement, Section. 5(d)(i).* Despite the Agreement's Section 29 confidentiality clause ("the Parties acknowledge and agree that this Agreement and each of its provisions are and shall be treated strictly confidential"), the very same day that Defendants sent Plaintiff the aforementioned Termination Letter, Defendants published and/or caused to be published a press release (appearing in "TipRanks," a widely disseminated industry publication), and an SEC Form 8-K, each publicly stating that Plaintiff was "terminated [from his CFO position at Defendant Callan] 'For Cause' in accordance with the terms of this Employment Agreement," and the Defendants disseminated that statement widely (*Comp. Par. 25; Par. 45).* Specifically, the statement read,

> "Effective as of May 13, 2025, the Company terminated Chief Financial Officer, Jeffrey A. Appleman, effective immediately. Mr. Appleman was terminated 'for cause' in accordance with the terms of his Employment Agreement dated October 1, 2024, as amended (the "Appleman Employment Agreement"). Mr. Appleman's termination was not related to the Company's financial or operating

results or to any disagreements or concerns regarding the Company's financial or reporting practices. Mr. Appleman will be entitled to any payments in connection with the termination of his employment, as provided for in and under the Appleman Employment Agreement."

See Plaintiff's Exhibit C: Press Release Alleging False "For Cause" Reason For Plaintiff's Termination[1]

In light of the above, Plaintiff brought claims against Defendants for breach of contract, defamation, tortious interference with business relations, and negligent infliction of emotional distress.

## ARGUMENT

Plaintiff respectfully requests that this Court deny Defendants' motion for partial dismissal of the Complaint. The purpose of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief, *St. John's Univ., NY v Bolton*, 757 F.Supp.2d 144, 156 (EDNY 2010). Here, Plaintiff's factual pleadings plausibly allege unlawful conduct and wrongdoing on Defendants' part.

A. FRCP 12(b)(6) Standard For Dismissal of A Complaint:

In reviewing the complaint, the court accepts as true all allegations of fact, and draws all reasonable inferences from the allegations in favor of the plaintiff. *See St. John's Univ., NY v Bolton*, 757 F.Supp.2d 144, 156 (EDNY 2010). A complaint is legally sufficient to survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (noting that this standard does not require heightened fact pleading of specifics); *see also DeSilva v North Shore long Is. Jewish Health Sys.*, 770 F.Supp.2d 497, 506 (E.D.N.Y. 2011) (the plausibility standard is not akin to a 'probability

---

[1] The Defendants entered the May 13, 2025 Statement into the record on the within Motion To Partially Dismiss the Complaint when Defendants quoted this statement verbatim in their Memorandum of Law In Support of Their Motion to Dismiss; See Defendants' Mem. Of Law., pg. 8, footnote 3. Plaintiff further had integral knowledge of this statement when framing his complaint. Accordingly, Plaintiff includes same as an Exhibit in opposition to Defendants' Motion To Dismiss. (*See In re Merrill Lynch & Co., Inc., 273 F.Supp.2d 351, 356-57 (S.D.N.Y. 2003)* (documents or information contained in defendant's papers are admissible as an Exhibit, as are documents that plaintiff has knowledge or possession of and relied on in framing the complaint).

4

requirement,' but asks for more than a sheer possibility that a defendant has acted unlawfully). A claim has facial plausibility when Plaintiff pleads factual content that allows the court to draw the reasonable inference that Defendant is liable for the misconduct alleged. *See Ashcroft v Iqbal*, 556 U.S. 662 (2009).

Moreover, the court's task is merely to assess the legal feasibility of the complaint, not to assess the weight of the evidence which might be offered in support thereof. *Levitt v Bear Stearns & Co.*, 340 F.3d 94, 101 (2nd Cir. 2003). The issue is thus whether the claimant is entitled to offer evidence to support their claim. *Villager Pond, Inc. v Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995). In adjudicating an FRCP 12(b)(6) motion, courts are entitled to consider: (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference; (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference; (3) documents or information contained in defendant's papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint; (4) public disclosure demands required by law to be, and that have been, filed with the Securities and Exchange Commission; and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence. *In re Merrill Lynch & Co., Inc.*, 273 F.Supp.2d 351, 356-57 (S.D.N.Y. 2003).

B. New York Law Governs Plaintiff's Tort Causes of Action:

As an initial matter, a federal court sitting in diversity jurisdiction must apply the choice of law rules of the forum state. *See Maryland Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2nd Cir. 2003). Thus, New York choice of law jurisprudence determines whether to apply New York or Texas law to Plaintiff's tort causes of actions. *See Discover Grp, Inc. v. Lexmark Intern., Inc.*, 333 F.Supp.2d 78, 83 (E.D.N.Y. 2004). Under New York law, a choice of law provision indicating that a contract will be governed by a certain body of law does not dispositively determine the law which will govern a tort claim arising incident to a contract. *See Winter-Wolff Intern. v. Alcan Packaging Food*, 499 F.Supp.2d 233, 239 (E.D.N.Y. 2007) (New York courts decide claims under New York law, not under the law selected by clause). [Emphasis added]. Generally, tort claims are outside the scope of contractual choice

of law provisions that specify what law governs construction of the contract's terms. *Finance One Public Co. Ltd. v Lehman Bros. Spec. Financing Inc.*, 414 F.3d 325, 335 (2nd Cir. 2005); *ABB, Inc. v Havtech, LLC*, 2019 NY slip op 30095 (non-contractual, tort claims generally fall outside the scope of contractual choice of law provisions); *Melia v Zenhire, Inc.*, 2013 NY Slip Op 52254 (noting the United States Court of Appeals for the Second Circuit's interpretation that New York State courts are reluctant "to construe contractual choice of law clauses broadly to encompass extra-contractual causes of action," and that tort claims fall outside of such provisions).

While an agreement's choice of law provision will apply to tort claims incident to a contract if the provision's express language is sufficiently broad as to encompass the entire relationship between the contracting parties, in *Finance One Public Co. Ltd.*, the Second Circuit found that there were no reported New York state cases where a contractual choice of law clause was drafted broadly enough to reach tort claims. *Id.*; *see e.g. Winter-Wolff Intern Inc.*, 499 F.Supp.2d at 241 (the contractual language as to "all questions arising hereunder" in a choice of law clause was <u>not</u> sufficiently broad to encompass tort claims) [Emphasis added]; *see also Knieriemen v Bache Halsey Stuart Shields Inc.*, 74 A.D.2d 290 (1st Dept. 1993) ("that the parties agreed that their contract should be governed by an expressed procedure does not bind them as to causes of action sounding in tort"); *see also Hughes v LaSalle Bank*, 419 F.Supp.2d 605, 616 (S.D.N.Y. 2006) (the contract did not provide for choice of law for any and all disputes with respect to the parties dealings, and therefore, did not apply to the tort claims); *See Finance One Public Co. Ltd.*, 414 F.3d at 333-335 (noting New York courts' reluctance to read a contract's choice of law clauses broadly and holding that choice of law provision in contract not broad enough to include extra-contractual set-off rights).

Thus, where the parties are domiciled in different states, and the issue is the standard governing the defendant's conduct, the <u>place or location of the tort is determinative.</u> *See Discover Grp. Inc. v Lexmark Int'l, Inc.*, 333 F.Supp.2d 78, 85 (E.D.N.Y. 2004) [Emphasis added]. This "interest analysis" is a flexible approach intended to give controlling effect to the law of the jurisdiction which has the

greatest concern with the specific issue raised in the litigation. *Cooney v Osgood Mach., Inc.*, 81 N.Y.2d 66 (1993).

In this case, the Agreement's choice of law clause states that, "the validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Texas" (*Complaint, Exhibit A; Agreement, Section 31*) —a clause found not broad enough to reach tort claims incident to the contractual relationship. See *Finance One Public Co. Ltd.*,,, 414 F.3d at 333-335. The tort claims Plaintiff alleges (including tortious interference with business, defamation, and negligent infliction of emotional distress) are based on Defendants' wrongful conduct *incidental to* the validity, interpretation, or performance of the Agreement. Given New York courts' reluctance to construe contractual choice of law clauses broadly to include tort causes of action, and in light of the fact that no reported New York cases present such a broad contractual clause, the choice of law provision in the Agreement does not reach Plaintiff Jeffrey Appleman's tort claims. Said claims originated in New York State, where Plaintiff lives and performed his duties for Defendants remotely, and where Plaintiff suffered the injury in question. *Comp. Par. 4. See Winter-Wolff Intern. v. Alcan Packaging Food*, 499 F.Supp.2d 233, 239 (E.D.N.Y. 2007).

As such, New York has the greater interest in regulating this conduct, thus warranting this Court to apply New York law to Plaintiff's tort causes of action.

## POINT I

### Defendants' Breaches Stem Not From Terminating The Agreement, But From Unlawfully Terminating Plaintiff's Employment "For Cause" And In Violation Of The Agreement, Paragraph 5:

Defendants opted to terminate Plaintiff's employment "for Cause" but gave woefully inadequate rationale for same, and did not comply with contractual conditions for either a "for Cause" termination or a termination without Cause. Section 5(c) of the Agreement states that:

> "Company may terminate Executive's employment hereunder for Cause, as defined in Section 11(c), at any time upon notice to Executive setting forth in reasonable detail the nature of such Cause. Upon the giving of notice of

termination of Executive's employment hereunder for Cause, Executive will receive Executive's Final Compensation. Any notice of termination of Executive's employment hereunder for Cause, or any notice to Executive regarding any event, condition or circumstance that, if not cured, if applicable, in accordance with the above, could give rise to a termination of Executive's employment hereunder for Cause, shall set forth in detail the applicable event(s), condition(s) or circumstance(s) constituting reason(s) or potential reason(s) for such termination hereunder."

Section 11(c) of the Agreement further explains that:

"'Cause' means if Executive is discharged by Company on account of the occurrence of one or more of the following events:

(i) Executive's continued refusal or failure to perform (other than by reason of Disability) Executive's material duties and responsibilities to Company if such refusal or failure is not cured within thirty (30) days following written notice of such refusal or failure by Company to Executive, or Executive's continued refusal or failure to follow any reasonable lawful direction of the Board if such refusal or failure is not cured within thirty (30) days following written notice of such refusal or failure by Company to Executive; or

(ii) willful, grossly negligent, or unlawful misconduct by Executive which causes material harm to Company or its reputation."

*Complaint, Exhibit A, Agreement, Section 11(c)* [Emphasis Added].

Had Defendants terminated Plaintiff's employment "other than for cause," Section 5(d) mandates, "thirty (30) days' written notice to Executive" and, in addition to final compensation, Plaintiff was contractually entitled to receive:

(1) payment of applicable Base Salary for the period of (a) six (6) months from the date of termination, when the said termination is effected after first anniversary of the Effective Date . . . and

(2) if the date of termination occurs after the end of a calendar year but prior to the date on which a Bonus is paid under Section 4(b), payment of such Bonus as determined under Section 4(b) shall be at the time proscribed by Section 4(b); and

(3) payment of a pro-rata portion of the amount of Executive's Bonus for the year in which termination occurs that would have been payable based on actual performance determined under the terms of the Bonus as then in effect for such year . . . .

*See Complaint, Exhibit A: Agreement Section 5(d)(i).*

Not only did Defendants give meager rationale to substantiate their "for Cause" termination of Plaintiff, but they failed to provide Plaintiff with a 30-day opportunity to cure any alleged grounds for Cause termination – in stark breach of the Agreement, Sections 5 and 11. *(See Comp. Par. 14 and 39; Comp. Exhibit A, Sections 5 and 11)*. Defendants' moving papers cited *Gulf Liquids New River Project, LLC v Gulsby Eng'g, Inc.,* 356 S.W.3d 54, 66 (Tex. App. 2011), for the proposition that, because they had the right to terminate Plaintiff's employment for cause or without cause, they could not have breached the Agreement by terminating it. However, the act of terminating the Agreement itself is not the essence of Plaintiff's claim for breach of contract. Terminating the Agreement did not excuse Defendants' breach of their obligation to provide Plaintiff with the required written notice *and 30 days' opportunity to cure the complained of conduct. Id*.; *See also Complaint Exhibit A: Agreement, Section 5.* Thus, Defendants' prior breach means that Plaintiff's termination was improper, as written notice and 30 days' opportunity to cure any alleged grounds for Cause were required for termination (for and without cause); accordingly, Plaintiff is entitled to damages for wrongful termination (addressed *infra*).

Because Defendants have been unable to articulate a plausible basis on which to terminate Plaintiff "for Cause," Plaintiff maintains that, had Defendants not breached the substantive clauses *and the spirit of* the Agreement, then Mr. Appleman would have continued in his employment with the Company, at the very least, beyond his one-year Effective Date. The purpose of having a "For Cause" termination clause was to provide Plaintiff with a contractual promise of job security (i.e., the reassurance that he would not be terminated if he did not give the Defendants Cause to terminate). Moreover, the Defendants' Press Release / SEC statement acknowledged that Plaintiff, "Mr. Appleman's termination was not related to the Company's financial or operating results" (thus, there appeared to be none of the typical "without Cause" grounds for termination, such as financial hardship or logistical and operating difficulties, as might warrant a without Cause termination). Indeed, a factual issue remains in dispute as to whether or not the Plaintiff would have been terminated *if the Defendants had adhered to their express contractual obligations, and their implied contractual obligations to not fire Plaintiff under*

*a false, pretextual "for Cause"* allegation, without notice or 30 days to cure any alleged performance issue. Accordingly, Plaintiff maintains that a minimum of six (6) months of annual base salary in severance pay is appropriate, as Plaintiff would have been employed by the Defendants beyond his 1-year anniversary date *but for* Defendants' bad faith / breach of the Agreement. *See Comp., Exhibit A, Sections 5 and 11*).

In the event that Plaintiff's termination is deemed to be "without cause," then, at the very least, Plaintiff should be entitled not only to his final compensation, but also to payment of any upcoming 4(b) bonuses earned during the calendar year, as well as payment of the pro-rata portion of his annual bonus. The Defendants cite *Payne v Enable Software Inc.*, as an example of a court limiting damages to the extent provided in the Agreement, 229 A.D.2d 880, 882 (1996), as well as *Leblanc v Bedrock Petroleum Consultants, LLC*, to establish that courts look to the unambiguous language of a contract in determining damages, No. CV H-20-3476, 2021 WL 3884265 (S.D. Tex. Jun 3, 2021). However, in the within action, the clear terms of the Agreement, Section 5(d)(i)(3), state that Plaintiff is entitled to bonus payments; specifically, "payment of a *pro-rata* portion of the amount of Plaintiff's Bonus for the year in which termination occurs that would have otherwise been payable" in addition to final compensation and benefits required by law. Notably, if the Court deems the Section 5 Termination clause ambiguous, in the context of a Rule 12(b)(6) motion, such contractual ambiguity should be resolved in favor of Plaintiff. *See Int'l Audiotext Network, Inc. v Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2nd Cir. 1995) (the Court is required to resolve all contractual ambiguities in favor of Plaintiff). Because Plaintiff has made specific, factual allegations that Defendants breached the Agreement; i.e., that his termination was not for Cause; and that damages are in dispute under the express provisions of the Agreement, such damages should not be limited to "final compensation owed" as sought by Defendants. *Leblanc v Bedrock Petroleum Consultants, LLC*, No. CV H-20-3476, 2021 WL 3884265 (S.D. Tex. Jun 3, 2021) (courts look to the *unambiguous* language of a contract in determining damages) [Emphasis added].

**POINT II**

**Defendants' Statement That Plaintiff Was Fired "For Cause" Constitutes Libel *Per Se,* And Is Inappropriate On A Motion To Dismiss For Failure To State A Cause Of Action.**

Under New York law, a defamation cause of action's legal elements include "a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation *per se*." *See Abedine v Lord Sec. Corp.*, 2017 NY Slip Op 30511. Any written or printed article is libelous or actionable, without alleging special damages, if it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly interactions in society. *See  Rinaldi v Holt, Rinehart*, 42 N.Y.2d 369, 179 (1977).

A. Defendants' Publication That Plaintiff Was Terminated "For Cause" Is
    Susceptible Of A Defamatory Meaning And Libelous *Per Se:*

Defendants argue that the alleged defamatory statement cannot have a defamatory meaning because it is [supposedly] truthful and nonspecific.  Defendants cite Texas cases for the proposition that statements made about an employee being fired based on "work performance" are non-specific, and thus, not reasonably capable of a defamatory meaning. *See e.g. Def. Mem. Of Law In Supp. (MOL) Pg. 9*. However, while "the mere statement of discharge or termination from employment . . . does not constitute libel," in this action, the Defendants' statement also included an announcement that Plaintiff was fired "for Cause" (*Comp. Par. 3 and Par. 25)* —which, by its nature and common understanding, can include a host of salacious, improper, and illegal rationale, thus supporting a claim for defamation. *See Chang v Fa-Yun*, 265 A.D.2d 265, 265 (1st Dept. 1999); *see e.g. Carney v Mem'l Hosp. & Nursing Home of Greene County*, 64 N.Y.2d 770, 772 (1985) ("to the extent that the defendants argue that the 'discharge for cause' statement was not defamatory because it means only that the hospital administrators

had a "reason," which may or may not be valid, for dismissing plaintiff, their argument must be tested against the understanding of the average reader.")

What matters in a defamation claim are the words actually uttered. *Brian v Richardson*, 87 N.Y.2d 46, 50-1 (N.Y. 1995). Courts must decide whether there is a reasonable basis for drawing a defamatory conclusion. *See James v Gannett Co.*, 40 N.Y.2d 415, 419 (1976). The rule is that if the words *taken in their natural and ordinary meaning* are susceptible to a defamatory connotation, then it is *for the jury to decide* how the statement would be understood by the average reader. *See Carney*, 64 N.Y.2d at 772 [Emphasis added]; *James*, 40 N.Y.2d at 419. Under Texas law, the standard is similar and "based upon how a person of ordinary intelligence would perceive the <u>entire</u> statement" [Emphasis added]. *See Izaguirre v Aguilar*, No. 13-19-00225-CV, 2021 WL 727017 (Tex. App. Ct., Feb. 25th, 2021).

In *Carney v Mem'l Hosp. & Nursing Home of Greene County*, the Court found that the plaintiff's defamation cause of action should not have been dismissed where the defendant published a statement that plaintiff was discharged "for cause." 64 N.Y.2d 770, 772 (1985). The *Carney* Court found such a written statement stated a valid cause of action in libel, and, to the extent defendants argued plaintiff was "wrong in alleging the statement [was] false, their argument may not be considered on a motion for failure to state a claim." *See Carney v Mem'l Hosp. & Nursing Home of Greene County*, 64 N.Y.2d 770, 772 (1985); *Nicholas v Item Publs.*, 309 N.Y. 596, 601 (1956) (explaining that, when the publication contains an insinuation that the dismissal was for some misconduct, it becomes defamatory); *see also Wasserman v Haller*, 216 A.D.2d 289 (2nd Dept. 1995) ("words that affect a person in his or her profession by imputing any kind of fraud, dishonesty, misconduct, or unfitness in conducting one's profession may be actionable"). The *Carney* court specifically stated that, "it cannot be said as a matter of law that the average reader of the statement that plaintiff was discharged "for cause" would not interpret it as meaning that plaintiff had actually been derelict in his professional duties." *Id.*; *see also November v Time Inc.*, 13 N.Y.2d 175, 179 (1963) ("the casual reader might not stop to analyze, but

could readily conclude that plaintiff is a crook and let it go at that"). Accordingly, the plaintiff was entitled to a jury determination of the issue, and plaintiff's defamation claim survived any motion to dismiss it. See *Carney*, 64 NY2d 770 (1985).

In this case, as in the case law cited above, Defendants' statement did not just reference Plaintiff Jeffrey Appleman's "work performance," but rather, included a statement that he was terminated "for Cause," – *thus offering any readers of that statement the reasonable conclusion that Plaintiff acted inappropriately or improperly, thereby warranting an unsavory opinion of him (based on said statement).* Plaintiff's Complaint includes particularized, factual allegations sufficiently pleaded that each of the Defendants: (a) made and disseminated stigmatizing (false) statements that (b) seriously hindered his ability to find work in his field (*Comp. Par. 27 – 30).* As a direct result of such statement by Defendants, Plaintiff has sustained a tangible burden on his future employment prospects (*Comp. Par. 52).* In his Complaint, Plaintiff further pleads that Defendants "published and/or caused to be published a press release, and an SEC Form 8-K, each publicly stating that Plaintiff 'was terminated [from his CFO position at Defendant Callan] 'for cause' in accordance with the terms of his Employment Agreement,' and disseminated that statement widely." *Comp. Par. 25*. Specifically, the publication stated:

> "Effective as of May 13, 2025, the Company terminated Chief Financial Officer, Jeffrey A. Appleman, effective immediately. Mr. Appleman was terminated 'for cause' in accordance with the terms of his Employment Agreement dated October 1, 2024, as amended (the "Appleman Employment Agreement"). Mr. Appleman's termination was not related to the Company's financial or operating results or to any disagreements or concerns regarding the Company's financial or reporting practices. Mr. Appleman will be entitled to any payments in connection with the termination of his employment, as provided for in and under the Appleman Employment Agreement."

*See Def. Mem. Of Law, Pg. 8 n. 3*; *See Plaintiff's Exhibit C (Article containing Defendants' May 2025 Statement); See also In re Merrill Lynch & Co., Inc.*, 273 F.Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (courts are entitled to consider documents 'integral' to the complaint and relied upon in it, even if not attached to the Complaint, or incorporated by reference).

The "terminated 'for cause' in accordance with the terms of his Employment Agreement" language in the Defendants' above statement has the precise meaning that Plaintiff engaged in *serious wrongdoing, gross negligence, incompetence, or unlawful activities,* which is <u>readily understood by reasonable people</u>, and is capable of being proven true or false. Furthermore, the language that "[Plaintiff's] termination was not related to the Company's financial or operating results or to any disagreements or concerns regarding the Company's financial or reporting practices" leaves readers and the public with the clear factual impression that Plaintiff committed a bad act so as to constitute and warrant Mr. Appleman's "for Cause" termination. (*Comp. Par. 27).* Accordingly, Plaintiff states a sufficient claim that Defendants' aforementioned statement was defamatory (libel), and thus, not subject to dismissal under FRCP 12(b)(6). *Chang v Fa-Yun,* 265 A.D.2d 265, 265 (1st Dept. 1999); *see e.g. Carney v Mem'l Hosp. & Nursing Home of Greene County,* 64 N.Y.2d 770, 772 (1985); *Brian v Richardson,* 87 N.Y.2d 46, 50-1 (N.Y. 1995).

Even *assuming arguendo* that the above meaning of the Defendants' statement is not precise, it can clearly be *interpreted by a reasonable person* that Plaintiff had actually been derelict in his professional duties, and thus, the statement exposes Plaintiff to the unsavory opinion of those in his field (*see cases* cited in Plaintiff's Mem. of Law, Point II-A, pgs. 12 – 14, *supra). see also Carney,* 64 N.Y.2d at 772 ("It cannot be said as a matter of law that the average reader of the statement that plaintiff was discharged "for cause" would not interpret it as meaning that plaintiff had actually been derelict in his professional duties"). Accordingly, Plaintiff's defamation claim is within the province of the factfinder, not subject to dismissal under FRCP 12(b)6.

Finally, Defendants argue that because they had the legal right to terminate Plaintiff's employment, exercising this legal right is not defamatory as a matter of law. *See Def. Mem. Of Law,. Pg. 9.* However, Defendants seemingly conflate their legal right to *terminate* Plaintiff's employment with their illegal conduct of *publishing falsities about* the nature of Plaintiff's termination to third parties. Several material factual issues remains in dispute as to: (a) whether or not Plaintiff's purported "for

cause" termination (as Defendants' stated) was false – a lie or pretext to discard Plaintiff under a knowingly false reason for his discharge;  (b) whether the Defendants knew "for Cause" to be a false reason provided to Plaintiff (and later stated publicly) for Plaintiff's termination, and (c) whether the Defendants were motivated by malice [intention to harm Plaintiff], or reckless disregard for the truth, in choosing to publish the aforementioned statement of Mr. Appleman's termination "for Cause" – especially with their intentional, additionally published language to drive home the point that Plaintiff's For Cause termination was not connected to (the potentially more neutral reasons of) the Company's financial or operating issues; see statement in its entirety, referenced above. *See Plaintiff's Exhibit C ("TipRanks" Article published on May 15, 2025*).

On a Rule 12(b)(6) motion to (partially) dismiss, the Court is not supposed to "take Defendants' word for it" that the Defendants' published statements about Plaintiff were true; or that they believed that their published statement about Jeffrey Appleman were true; or that same were not maliciously motivated. *St. John's Univ., NY v Bolton*, 757 F.Supp.2d 144, 156 (EDNY 2010); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *See* "Standard of Review" for an FRCP Rule 12(b)6 motion, *supra).*

B. Defendants' Defamatory Statement Is Not Protected By Qualified Immunity:

Defendants argue that their statement is entitled to qualified immunity because they supposedly had a legitimate business obligation to publicly disclose the change in the company's CFO (*Defendants' Mem. Of Law, pg. 9)*. Courts have recognized that public interest is served by shielding certain communications, though possibly defamatory, from litigation, rather than risk stifling them altogether. *Kamchi v Weissman*, 125 AD3d 142, 158 (2nd Dept 2014). One such conditional or qualified privilege extends to a communication made by a person to another upon a subject in which both have an interest. *See Liberman v Gelstein*, 80 N.Y.2d 429, 437 (1992). Defendants contend that there is a public interest (and an interest of Callan's shareholders) to hear their published statement about the Plaintiff, Jeffrey Appleman, CPA, and his termination from Callan.

However, the protection of the "common interest" qualified privilege "may be dissolved if [a] plaintiff can demonstrate that [a] defendant spoke with 'malice.'" *Id*. (To establish the malice necessary to defeat the privilege, the plaintiff may show either <u>common-law malice</u>, i.e. spite or ill will, or may show <u>actual malice,</u> i.e. knowledge of falsehood of the statement or reckless disregard for the truth) [Emphasis added]. *See Kamchi*, 125 A.D.3d at 142.

Here, Plaintiff can establish – and has pleaded – <u>both</u> common law and actual malice (*See Comp. Par. 25 – 29; Par. 44 – 48; Par. 51 – 53*). According to the amendment to the employment Agreement, Plaintiff was to receive certain stock options, including 100,000 stock options connected to Callan's public offering (IPO) with vesting quarterly per schedule. Plaintiff has evidenced that he was an exemplary employee who assisted Defendant Callan in going public in February, 2025. It is an easy inference (and one for a rational jury to determine) that Defendants terminated Plaintiff's employment soon thereafter as a way to ensure Plaintiff's stock options did not vest – thus, intending to cause Jeffrey Appleman to suffer economic harm, with reckless disregard for the lasting impact upon Plaintiff. (*Comp. Par. 25 – 29; Par. 44 – 48; Par. 51 – 53*).

Moreover, Plaintiff alleged in his Complaint that:

> "Many of the alleged deficiencies later cited by Defendants in their May, 2025 termination letter, as the supposed basis for Plaintiff's unlawful termination….were not the true reasons for Callan's and Williams' termination of Plaintiff. *In fact, as was known by all Defendants, the performance issues falsely alleged as the basis for Mr. Appleman's termination were either: (a) legacy or known pre-existing issues that pre-date Plaintiff's employment or consulting work; (b) were outside of Plaintiff's control, authority, or reporting chain; and/or (c) were the subject of Plaintiff's documented recommendations to senior leadership, including presentations in February 2025 identifying corrective actions and resource needs*, yet, Plaintiff's recommendations for corrective actions were ignored by Defendants and by their upper management, including being ignored by Defendant Williams (CEO of Callan)."

> *See Comp. Par. 20 [Emphasis added].*

Plaintiff's pleadings continued, alleging, "The Defendants' Termination Letter listed various generalized and/or pretextual criticisms of Plaintiff's job performance and service as CFO for Callan –

criticisms which are – and were known by Defendants to be – factually inaccurate, unparticularized, false, taken out of context, and / or concerning matters not within Plaintiff's remit, or predating his tenure as CFO." *See Comp. Par. 23* [Emphasis added].

Accepting Plaintiff's allegations as true, and drawing all reasonable inferences in favor of Plaintiff, a rational factfinder could conclude that Defendants acted with spite or ill will (common law malice), by publishing their false statements about the reason for Plaintiff's discharge in order to tarnish Plaintiff's reputation, and to prevent Plaintiff's stocks from vesting, all the while ensuring that the Defendants did not have to abide by the Agreement and the amendment thereto. *(Comp. Par. 27 –30, Comp. Par. 47).* Moreover, Plaintiff's factual allegations assert the Defendants' knowledge of falsehood of their statement, and / or reckless disregard for the truth *(See Complaint Par. 25 – 29; Par. 44 – 48; Par. 51 – 53).* As such, Plaintiff has sufficiently alleged that the Defendants made false statements of fact, with common law and/or actual malice, thus overcoming the common interest qualified privilege that arises in some defamation claims – whether viewed under Texas law or New York State law.

Should this Court opt to follow Texas law, Defendants' qualified immunity argument would similarly be defeated for the reasons set forth above. See *Bergman v Oshman's Sporting Goods, Inc.*, 594 S.W.2d 814, 816 n.1 (1980) (where publication is qualified, the claimant can overcome the privilege by showing that the defendant acted with actual malice); *see also Bentley v Bunton*, 94 S.W.3d 561, 591 (Tex. 2002) (in determining "actual malice," the reviewing court must consider the factual record in full and actual malice can be proven through circumstantial evidence); *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex.1989) ("actual malice is not 'ill will'; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true"); see also *Casso v Brand*, 776 S.W.2d 551 (1929) (when the defamation defendant offers evidence that is "clear, positive and direct" as to the lack of actual malice, the plaintiff must offer controverting proof to establish a fact issue as to malice). Here, Plaintiff has offered controverting proof that Defendants subjectively knew the "for cause" statement was false

and motivated by malice. *Comp. Par. 25 – 29; Par. 44 – 48; Par. 51 – 53).* Discovery ought to proceed

to shed light on Defendants' malice in publishing knowingly false statements about Plaintiff.

*POINT III*

**Plaintiff Has Sufficiently Alleged A Cause Of Action For Defendants'**
**Tortious Interference With Prospective Business Relations:**

Defendants incorrectly argued that Plaintiff's cause of action for Tortious Interference With

Prospective Business Relations should be dismissed because Plaintiff's pleadings (supposedly) did not

allege that Plaintiff had a reasonable probability of entering a specific business relationship, or any

independently tortious or unlawful conduct. *Def. MOL, pg. 12.*

To prevail on a claim for tortious interference with prospective economic relations under New

York law, a plaintiff must show that: (1) Plaintiff had business relations with a third party; (2) Defendant

interfered with those business relations; (3) Defendant acted with the sole purpose of harming the

plaintiff, or used dishonest, unfair, or improper means; and (4) Defendant's acts injured the relationship.

*See Gama Aviation Inc. v Sandton Capital Partners, LP*, 2013 NY Slip Op 32648. Under New York law,

"conduct constituting tortious interference with business relations is, by definition, conduct directed not

at the plaintiff . . . but at the party with which the plaintiff has or seeks to have a relationship." *See Carvel*

*Corp. v Noonan*, 3 N.Y.3d 182, 192 (2004). Damages for interference with prospective relations may be

awarded only where "a defendant engages in conduct for the sole purpose of inflicting intentional harm

on plaintiff" or where the means employed by the one interfering were "wrongful" (generally, the

"wrongful means" that make such interference actionable "must amount to a crime <u>or an independent</u>

<u>tort</u>"). *Carvel Corp. v Noonan*, 3 N.Y.3d 182, 192 (2004) [Emphasis added] ("defining wrongful means

as "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees

of economic pressure). That said, the Court of Appeals did not preclude "other instances of conduct

which, though not a crime or tort in itself," are so culpable that they could be the basis of such a claim.

*Law Offices of Ira H. Leibowitz v Landmark Ventures, Inc.*, 131 A.D.3d 583, 588 (2d Dept 2015).

18

In this case, Plaintiff sufficiently pleads his tortious interference cause of action. Defendants argue that Plaintiff alleges "in the most conclusory manner, that he is not hirable" but fails to allege "as he must, the specifics of any concrete job offer or proposed agreement." *Def. Mem Supp. P. 12.* However, unlike the cases cited by Defendants, Plaintiff's Complaint *did reference* a *specific business relationship* that failed to come to fruition based on Defendants' actions. For example, Plaintiff pleads that his "previous fractional CFO firm declined to rehire him because "prospective clients would Google 'Jeffrey Appleman' [Plaintiff] and see he had been 'fired For Cause,' thereby rendering Plaintiff 'not hirable,'" *See Comp. Par. 30*; *contra*: *Pureshield, Inc. v Allied Bioscience, Inc.*, No. 4:20-CV-734-SDJ, 2021 WL 4492861, at *3 (E.D. Tex. Sept. 30, 2021) (Plaintiff failed to identify any specific entity with whom it would have contracted but for Defendant's alleged misconduct); *contra: I love Omni, LLC v Omnitrition Int'l, Inc.*, No. 3:16-CV-2410-G, 2017 WL 3086035 (N.D. Tex. July 20, 2017) ([unlike in this action], the *Omni* Plaintiff merely pointed to 'unspecified individuals' and 'some unspecified business relationship'); *contra: Corrosion Prevention Techs. LLC v Hatle*, No. 4:20-CV-2201, 2020 WL 6202690 (S.D. Tex. Oct 22, 2020) (dismissing counterclaim for tortious interference where, contrary to the within pleading, no facts showing what business relationship Plaintiff expected to have with the listed businesses).

Contrary to the above cases cited by Defendants' motion papers, here, Plaintiff has established and pled that: (1) he had business relations with his former employer to rehire Plaintiff; (2) Defendants engaged in independent wrongs by: publishing false / harmful statements about Plaintiff, and by preventing Plaintiff from acquiring further and future stock options, and hindering Plaintiff's new employment efforts; and (3) the statement about Plaintiff's termination was published in this district and Plaintiff lost an economic opportunity due to Defendants' conduct. See *Comp. Par.* 30; see also *Amaranth LLC v J.P. Morgan Chase & Co.*, 71 A.D.3d 40 (1st Dept. 2009) (because the complaint does not merely rely on generalized reputational harm, we find that it sounds in tortious interference). Under both Texas law and New York law, Plaintiff has sufficiently made out a cause of action for tortious

interference with prospective business relations, and should survive Defendants' 12(b)(6) motion for failure to state a claim. *St. John's Univ., NY v. Bolton*, 757 F.Supp.2d 144, 156 (E.D.N.Y. 2010) (accepting as true all allegations of fact; drawing all reasonable inferences from the allegations in favor of the plaintiff).

## POINT IV

### The Confidentiality Requirement, Section 29 Of The Agreement, Expressly Applies To, And Was Breached By, Defendants.

Despite Defendants' best efforts to interpret otherwise, the Agreement's confidentiality clause clearly applies to Defendants and Plaintiff. In the *Complaint, Exhibit A, The Agreement, Par. 29* expressly lays out that, "[t]he Parties acknowledge and agree that this Agreement and each of its provisions are and shall be treated as confidential." *Even if* this provision is subject to more than one reasonable interpretation, in the context of a Rule 12(b)(6) motion, the Court is required to resolve all contractual ambiguities in favor of Plaintiff. *See Int'l Audiotext Network, Inc. v Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2nd Cir. 1995).

The second part of Defendants' alleged libelous termination statement / press release  ("Mr. Appleman's termination was not related to the Company's financial or operating results or to any disagreements or concerns regarding the Company's financial or reporting practices") goes beyond what is operationally necessary for Defendants (or what is required statutorily for SEC filings). Wherein Defendants could have simply stated that Plaintiff, Jeffrey Appleman, was terminated effective immediately, they chose to instead reference the following adverse, harmful, and false statements (publicizing the terms of the Employment Agreement between Plaintiff and Defendant Callan): (i) (Defendants' published statement includes that) Cause existed for the termination under Plaintiff's Employment Agreement; (*Comp. Par. 1, Par. 3, Par. 20*); (ii) the employment Agreement impacted was identified as existing; and (iii) Defendants published Plaintiff's specific payment rights (a term of the contract) under the Agreement. Defendants' statement not only referred to the Employment Agreement,

but further *publicized the terms of the Agreement and publicized the circumstances contemplated under the Agreement.* For example, the statement that Plaintiff was terminated "for cause in accordance with the Employment Agreement" necessarily reveals that the Agreement contains a for Cause-based termination provision, and that the provision was triggered. The Defendants' statement further reveals the existence and applicability of termination payments. Their statement goes on to further disclose the date of the Agreement and the fact that the Agreement was amended – all provisions of the Agreement that, per Agreement, Par. 29, ought to be kept confidential by "the Parties" under the Agreement (*Comp. Par. 14, Par. 36 – 40, Par. 54 – 58; See also Complaint, Exhibit A, Par. 29).*

Based on the above arguments and factual pleadings, Plaintiff respectfully asks this Court to deny Defendants' motion to dismiss Plaintiff's claim for breach of contract / breach of confidentiality provision (*Comp. Par. 54 – 58; Comp. Exhibit A, Section 29*). If the Defendants disagree about the interpretation of the Contract's confidentiality provision (and its scope vis-à-vis both parties or just the Plaintiff), such ambiguities should <u>not</u> be resolved in favor of the moving party (Defendants) on their 12(b)(6) motion to dismiss. *See Int'l Audiotext Network, Inc. v Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2nd Cir. 1995) (in the context of a Rule 12(b)(6) motion, the Court is required to resolve all contractual ambiguities in favor of Plaintiff).

**POINT V**

**Plaintiff's Negligent Infliction Of Emotional Distress Claim Arises Out Of Conduct Separate and Apart From the Agreement.**

Defendants allege that Plaintiff's negligent infliction of emotional distress claim fails as a matter of law because claims for emotional distress arising out of employment relationships are not cognizable. *See Def. Mem. Of Law, pg. 14.* However, the alleged false statements by Defendants <u>were extraneous to the employment Agreement</u>. A cause of action for reckless or negligent infliction of emotional distress are supported by allegations of conduct by the defendants that "has been so outrageous in character, and

so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Dennis vs. Napoli*, 2015 NY Slip Op 31540.

In this case, the entirety of Defendants' conduct — inclusive of their defamatory acts and additional tortious interference with prospective business relations — constituted a tort independent of the Agreement, which caused the physical manifestations of Plaintiff's emotional distress, as pleaded: extreme embarrassment, humiliation, mental anguish, depression, *insomnia, anxiety/panic attacks, physical somatised pain, loss of appetite, trauma, and other physical symptoms. Comp. Par. 35, 66, and 68* [Emphasis added]. Moreover, Plaintiff's allegations supporting this cause of action point to conduct so outrageous in character, and so extreme in degree, as to go beyond all possible boundaries of decency: (1) Defendants maliciously published false material about Plaintiff knowing of the devastating consequences, *Comp. Par. 1;* (2) Defendants maliciously terminated Plaintiff's employment so as to prevent him from acquiring stock options, *Comp. Par. 40;* and (3) Defendants Callan and Coldchain, as businesses with ample reach and authority, purposely interfered with Plaintiff's livelihood via the narrative disseminated to the public. *Comp. Par. 3.* In essence, Defendants abused their authority in order to avoid their financial obligations to Plaintiff, Jeffrey Appleman, CPA, and destroyed Mr. Appleman's professional standing in the process, as their widespread defamatory statement blacklisted him from future work as a CFO, permanently damaging him and foreseeably destroying his career. Such acts led to the emotional harm and physical manifestations (as pleaded in Plaintiff's Complaint, Par. 63 – 68). This conduct is separate and apart from the Agreement at issue, and Plaintiff's negligent infliction of emotional distress claim is sufficient to survive the within FRCP 12(b)6 motion to dismiss.

### POINT VI

**Plaintiff Sufficiently Pleads Coldchain's Liability On Grounds That Coldchain Acted As Plaintiff's Joint Employer; Acted As Callan's Alter Ego And / Or Agent; And Manifested An Intent To Be Bound By The Agreement.**

Plaintiff's Complaint has plausibly alleged theories under which to hold Coldchain liable. In New York, if a party is not a party to a contract, it cannot be sued for its breach, *unless* there is a separate

basis for the non-parties' liability, such as: (i) piercing the corporate veil, (ii) a manifestation of an intent to be bound, or (iii) where there is the functional equivalent of privity between the signatories and the non-signatory. *Pacific Carlton Dev. Corp. v 752 Pacific, LLC*, 62 A.D.3d 677 (2nd Dept. 2009); *see also Gardner v Sensio Inc.*, 645 F.Supp.3d 310, 320 (S.D.N.Y. 2022). Distinct corporate entities constitute a "single employer" where two nominally separate entities are part of a single integrated enterprise so that, for all purposes, there is in fact only a single "employer." *Cruz v Robert Abbey, Inc.*, 778 F. Supp. 605, 610 (E.D.N.Y. 1991). Whether a party is a joint employer is a factual issue, involving: (a) common ownership; (b) common management; (c) interrelated operations; and (d) centralized control of labor & employment relations. *Clinton's Ditch Co-op Co., Inc. v NLRB*, 778 F.2d 132, 137 (2nd Cir. 1985).

Moreover, courts have determined that a *non-signatory* [such as Defendant, Coldchain] manifests its *intent to be bound by a contract* where that party "assumed the obligations of the contract;" whether an entity manifests an intent to be bound by assuming contractual obligations "is based on the totality of [that entity's] expressed words and deeds. *Jennings v Hunt Companies, Inc.*, 367 F.Supp.3d 66, 71 (S.D.N.Y. 2019) [Italics Added]. *See also Impulse Marketing Grp. Inc. v Nat'l Small Bus. All., Inc.*, No. 05-CV-7776, 2007 WL 1701813, at *6 (S.D.N.Y. June 12, 2007) (An allegation that Defendant assumed obligations of a contract will survive a motion to dismiss where Defendant "played a considerable role in the management and performance of the [c]ontract" and (as in the within matter*) "paid for [p]laintiff's services*" as provided for in the contract, such that the defendant "assumed the role of a party to the [c[ontract . . . suggest[ing] that the parties were in privity") [Emphasis and italics added]. Finally, under the functional privity theory, a party may be liable for breach of contract where a plaintiff alleges that party was the agent or subcontractor of a contracting entity, in privity with the plaintiff. *See E.C. Contracting, Inc. v D.F. Pray, Inc.*, No. 19-CV-6813 2022 (E.D.N.Y. Jan 12, 2022); *In re Cavalry Const.*, 425 F.Appr'x 70 (2d Cir. 2011).

Here, New York law applies in deciding whether Coldchain is liable under the Agreement, and not the choice of law clause in the Agreement. However, even if Texas las did apply, the net result would

not change. *In re Merrill Lynch Trust Co.*, FSB, 235 S.W.3d 185, 194 (2007) (Texas has long recognized that non-parties may be bound to a contract under traditional contract rules like agency or alter ego); *CNOOC Southeast Asia v Paladin Resources*, 222 S.W.3d 889, 895 (Tex. Ct. Appl. 5th Dist. 2007) (citing cases speaking to theories to bind a non-signatory to a contract involving alter ego, or substantial interconnected and concerted misconduct by defendants, single business enterprise, and agency); *see also Lennar Homes of Texas Land v Whiteley*, 625 S.W.3d 569 (Tex. Ct. App. 2021) ("generally, a party cannot be held liable under another party's contract without an express or implied assumption of the obligations of that contract"); *S. Union Co. v City of Edinburg*, 129 S.W.3d 74, 87 (Tex. 2003) (Texas law has recognized specific legal theories under which corporation structure can be disregarded to hold corporate actors jointly and severally liable for corporation's contractual obligations); *Kellog Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (six recognized theories may bind non-parties: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and /or (6) third party beneficiary).

Plaintiff has adequately alleged theories under which to hold Coldchain liable under the Agreement. First, even as a non-signatory to the Agreement, Coldchain was a joint employer of Plaintiff, as demonstrated by the pleadings (*Comp. Par. 7 and Par. 37*), and further demonstrated by Plaintiff's Exhibit B, annexed to the within opposition papers (*see Plaintiff's Exhibit B*, a W-2 Statement from Coldchain to Plaintiff in year 2025, reflecting that Coldchain paid Plaintiff's wages and salary when he worked for Callan as their full-time CFO). Moreover, Plaintiff's Complaint properly pleaded that Coldchain was in functional privity with Plaintiff (even if not using those identical words).[2]

---

[2] The Complaint alleges: (i) Coldchain acted at all relevant times as Callan's agent and/or *alter ego*, *Comp. Par.* 6; (ii) the Defendants, Callan and Coldchain, were joint employers of Plaintiff, "with rights to hire and fire Plaintiff and to otherwise facilitate the terms of, and changes thereto, Plaintiff's employment with Callan and Coldchain," *Comp. Par.* 7; and (iii) Defendants Coldchain and Callan shared employees, as Defendant, Williams, "serves as Defendant Callan's Chief Executive Officer, and further served as the Executive Director of Defendant Coldchain (and is a Member) and personally participated in the tortious acts and breach of contract complained of." *See Comp. Par. 8; See also Plaintiff's Exhibit B: Plaintiff's Form W-2 Wage Statement.*

Finally, as an alleged "joint employer," Defendant Coldchain, as well as Defendant Williams, are alleged to have participated in drafting, approving, authorizing, ratifying, or disseminating the defamatory statement referenced in the Complaint and in the within opposition brief, and thus, Coldchain and Williams are subject to direct corporate liability. *Chico Auto Parts & Servs v Crockett*, 512 S.W.3d 560 (8th Dist. 2017) (corporation's affiliate may be liable for tortious acts without the need to pierce the corporate veil); *Leyendecker & Assoc., Inc. v Wechter*, 683 S.W.2d 369, 375 (Tex. 1984) (holding both corporation and its agents may be liable for defamation); *NY Univ. v Cont'l Ins. Co. et al.*, 87 N.Y.2d 308 (1995) (Defendant may be liable in tort when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations).

## <u>CONCLUSION</u>

For the aforementioned reasons, Plaintiff respectfully requests that this Court issue an Order, denying Defendants' FRCP 12(b) 6 motion for partial dismissal of the Complaint, with prejudice. If the Court does determine that any part of Plaintiff's claim (or claims) requires additional language pleaded, Plaintiff respectfully seeks leave to amend Plaintiff's Complaint in the within action.

Dated: February 27, 2026
    New York, NY

Respectfully Submitted,

**SARVER LAW FIRM, PLLC**

By:    *Eric M. Sarver Esq*
Eric M. Sarver, Esq. (ES-4454)
*Attorneys for Plaintiff*
Sarver Law Firm, PLLC
106 West 32nd Street, Suite 147
New York, New York 10001
Tel: (917) 930-8684
Fax: (212) 409-8529
Email: ems@sarverlawfirm.com