# SARVER LAW FIRM, PLLC

106 West 32nd Street, Suite 147
New York, NY 10001

Tel: (917) 930-8684

E-mail: ems@sarverlawfirm.com

Fax: (212) 409-8529

Website: www.sarver-law.com

May 5, 2026

<u>**VIA ECF and by FedEx to Judge Wicks:**</u>
The Honorable James M. Wicks
United States Magistrate Judge
Alfonse M. D'Amato U.S. Courthouse, 100 Federal Plaza
Central Islip, NY 11722

Re:  *Appleman v Callan JMB Inc., et al*., No. 15-CV-05593
     <u>Request for Pre-Motion Conference – Motion for Leave to Amend</u>

Dear Judge Wicks:

Our firm represents Plaintiff, Jeffrey Appleman, ("Plaintiff") in the above referenced action. Pursuant to Rule 3(D)(1) of Your Honor's Individual Motion Practices and Rules, Plaintiff respectfully submits this letter concerning his request to file a motion, pursuant to Fed. R. Civ. P. (FRCP) 15, and FRCP 16(b) 4, for leave to amend his complaint by May 14, 2026. Plaintiff attaches a complete copy of the Proposed Amended Complaint, with proposed amendments in redline (red ink for additions and strike-through for deletions) to set forth the exact changes sought to the pleadings (Exhibit 1). If the Court desires a pre-motion conference, Plaintiff remains ready and available for said conference.

### i.    *Relevant Background Facts:*

This action was brought by Plaintiff, a sophisticated CFO who had been employed by Defendant, Callan JMB Inc. ("Callan") when his employment was abruptly terminated, under the pretextual guise of "for cause." Thereafter, Defendants published this (false) "for cause" termination and broadcast it to investors, industry peers, and the market at large, resulting in substantial damages to Plaintiff's professional reputation, as well as his efforts to seek reemployment (in the job market, and at his prior employer, CFO Consulting Partners).  On October 6, 2025, Plaintiff filed his Verified Complaint in the EDNY (ECF, Dkt #1). On January 30, 2026, Defendants filed a motion to partially dismiss Plaintiff's Complaint, which Plaintiff opposed. On April 15, 2026, Your Honor granted said motion in part and denied it in part, dismissing Counts II (declaratory judgment), III (defamation), IV (tortious interference with prospective business relations), Count V (breach of contract – confidentiality/nondisclosure), and Count VII (negligent infliction of emotional distress), *without prejudice / with leave to amend the complaint*. Specifically, as to Count III, defamation, the Court stated: "Plaintiff's assertions that the statements were made "knowingly," without pointing to how, bears more on the breach of contract claim than tort claims as the malice component is missing. The Court is unable to discern actual malice from the current pleading." Decision & Order, pg. 17, ECF Dkt #29. As to Count IV, tortious interference with prospective economic relations, Your Honor wrote, in part, "Plaintiff does not further outline what

the wrongful means were or provide additional allegations apart from the above on the more culpable required conduct . . . Without more, the Court may not determine even assuming the truth of the pleadings, what wrongful means were used." Decision & Order, pg. 19, ECF Dkt # 29.

Plaintiff now seeks, for the first time, in line with your Honor's April 15, 2026 Order, to file a motion per FRCP 15 and FRCP 16(b)4, with an Amended Verified Complaint, to add new allegations that: (1) sufficiently plead legally cognizable claims sounding in defamation and tortious interference with prospective business relations; and (2) raise triable issues of fact as to Defendants' actual malice, common law malice (defamation) and independent wrongful means (for his tortious interference claim). Plaintiff has carefully considered the Court's April 15, 2026 Decision on the Defendants' motion to dismiss, and has thus opted not to pursue his dismissed claims of Declaratory Judgment (Count II), Breach of Contract – Confidentiality / Nondisclosure (Count V), or Plaintiff's Negligent Infliction of Emotional Distress (Count VII).

### ii.    Standard For Leave To Amend:

When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint. *See Ronzani v Sanofi S.A.*, 899 F.2d 195, 198 (2nd Cir. 1990). *See also Porat v Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2nd Cir. 2006) (noting that "this Circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)"); *Board of Trustees of the Local Union v Mid Orange Mech. Corp.*, No. 17-cv-2669 (NSR) Dist. Court (SDNY 2020) ("the rule in this Circuit has been to allow a party to amend its pleading in the absence of a showing by the nonmovant of prejudice or bad faith.") As such, leave to amend a complaint "shall be freely given when justice so requires." *See Fed.R. Civ.P. 15(a).* Although the decision whether to grant leave to amend is within the discretion of the district court, refusal to grant leave must be based on a valid ground. *Ronzani v Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990). Moreover, FRCP Rule 16(b)(4) provides that "[a] schedule may be modified only for good cause and with the judge's consent," where "'good cause' depends on the diligence of the moving party." Fed. R. Civ. P. 16(b)(4). A finding of "good cause" under Rule 16 generally depends on the diligence of the moving party. *See Sharbat v Iovance BioTherapeutics, Inc.*, No. 20 Civ. 1391 (ER) Dist. Ct (SDNY 2022) (courts often find good cause where a party <u>acts diligently</u> to amend after learning new facts in discovery). [Emphasis added].

Plaintiff seeks to amend his Verified Complaint, for the first time, early on in the case – less than three weeks after this Court's decision on Defendants' 12(b)(6) motion, and less than two months after the March 20, 2026 date to amend that was listed in the Court's Rule 26 Scheduling Order [ECF Dkt Entry #16]. Plaintiff has good cause for seeking this amendment because he has diligently pursued this action, has taken efforts to gather information, and has been actively seeking discovery, despite receiving generic objections from Defendants as to Plaintiff's Requests for Document Production.[1] Such efforts have led to the newly pleaded facts in the attached proposed Amended Complaint.

### iii.    *Plaintiff Has Diligently Pursued This Action; The Amendment Sought After The Court's Scheduling Order Is Excusable Due To Newly Ascertained Facts:*

---

[1] For the sake of full transparency, Plaintiff notes that Defendants' counsel appears to be acting in good faith thus far, as there have been two meet-and-confers between late March and late April to discuss the scope of document production requests and the nature of search terms that Defendants might use. Plaintiff has amended numerous Document Production Requests in an effort to maximize productive document responses. Nonetheless, while Plaintiff did receive a large batch of email inbox documents, Plaintiff has not yet received responses to many of Plaintiff's outstanding document production requests, including documents which, Plaintiff believes, combined with depositions, will further support the factual allegations of his proposed Amended Complaint.

Since filing Plaintiff's Verified Complaint in early October, 2025, Plaintiff has diligently pursued this matter and, to the best of his ability, has performed his own internal review of is prior employment with Defendant Callan, learning more facts and piecing together more information over the past few months. The initial Complaint in October, 2025 was based on what Plaintiff remembered at the time, and additional details and memory gaps of Plaintiff are now coming to light. Moreover, after further conversations with his undersigned counsel, Plaintiff now better understands – and has been able to convey – the significance of certain interactions that he had with the Defendants prior to his termination. The facts of these interactions are sought to be included in the proposed FRCP 15 and 16(b)4 motion for leave to amend, and in the Amended Complaint (see Exhibit 1 to this pre-motion letter).

Subsequent to the motion to dismiss, Plaintiff has clarified some of his insights and recollection of events. Specifically, Plaintiff now seeks to amend his complaint and plead: (i) Defendant Wayne Williams ("Mr. Williams") was hostile towards him throughout his employ and showed animosity towards Plaintiff shortly before publishing the false statements about him; (ii) Defendant Williams pressured Plaintiff into resigning, and when he refused to do so, Defendant Williams threatened Plaintiff (right at the time of the published statement in question) that "bad things were going to happen" for Plaintiff if he did not resign; (iii) Defendant Williams and his wife, also an employee of Callan, despised Plaintiff and resented him for his CFO role; upon information and belief, Ms. Williams worked closely with Defendant Williams *in relation to plaintiff's termination and the (knowingly false) publication of Mr. Appleman's for-cause termination*; (iv) employees who recognized Plaintiff's work ethic and value conveyed to the Defendants, *shortly before they published the statement that Plaintiff was fired "for cause,"* that such a statement was not accurate, *yet the Defendants recklessly disregarded this truth,* and nonetheless published their statement that Plaintiff engaged in for cause conduct warranting termination; and (v) Callan and Plaintiff's former employer, CFO Consulting Partners, LLC had been engaged in a legal dispute and, upon information and belief, the Defendants engaged in additional, independent conduct of making fraudulent and malicious misrepresentations about Plaintiff's job performance *directly to CFO Consulting Partners, LLC*, with the goal of disrupting a foreseeable and anticipated business relationship between Plaintiff and CFO Consulting Partners LLC, post-termination from Callan. *See Exhibit 1, attached.*

Plaintiff has been processing (and conveying) the above referenced facts in support of Plaintiff's position that Defendants acted with actual malice and common law malice (see Exhibit 1; Proposed Amended Complaint). These newly processed / newly revealed facts also demonstrate the independent wrongful means used by Defendant in interfering with his prospective business relation. Plaintiff seeks discovery relating to communications between Defendants and Plaintiff's former employer, CFO Consulting Partners LLC. Plaintiff recalled that CFO Consulting Partners had a dispute with Defendants (the precise details of which are believed to be kept confidential as part of a settlement; Plaintiff believes that discovery will bear out the details of such a dispute, and support his amended pleadings).[2] *See Scheuer v Rhodes*, 416 U.S. 232, 236 (1974) (the issue is not whether a plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims). *See also In re Everfresh*

---

[2] Plaintiff firmly believes that Defendants' responses to Plaintiff's Document Production Requests will uncover documents and communications in support of Plaintiff's (amended) claims, including (a) communications between Defendants and CFO Consulting Partners, LLC regarding Defendants' motives in the publication of Plaintiff's "for cause" termination. Plaintiff further believes that the pending responsive discovery, combined with future depositions of Mr. Williams and other key Callan employees – will shed light on a rift/ legal fight / arbitration that occurred between Defendants and Plaintiff's former employer, CFO Consulting Partners, in support of Plaintiff's tortious interference w/business relations claim (to be addressed in Plaintiff's FRCP 15 motion and amended pleadings).

*Beverages, Inc.*, 238 BR 558, 571 (Bankr. SDNY 1999) (the court must read the complaint generously and draw all reasonable inferences in favor of the pleading party).

In light of the foregoing, Plaintiff respectfully invokes this Court's procedure for filing a pre-motion letter so that he may formally move the Court, pursuant to FRCP 15 and 16(b)4, for leave to amend (with a deeper dive into the case law in support of Plaintiff's request). As for a briefing schedule: I have conferred with Defendants' counsel and they are amenable to the following schedule (subject, of course, to Your Honor's approval): Motion to be filed by May 14, 2026 (per the Decision & Order); Opposition papers to be filed by June 11, Plaintiff's Reply brief by July 2, 2026.

Thank you for our attention to the within pre-motion letter.

Sincerely,

*Eric M. Sarver Esq*

Eric Sarver, Esq.

Cc:     Andrew Zinman, Esq. (Via ECF)
Wynee Ngo, Esq. (Via ECF)
Mr. Jeffrey Appleman (Plaintiff)

# EXHIBIT 1

JEFFREY APPLEMAN, CPA          Plaintiff,

**PROPOSED**

**DRAFT:**

-against-

**VERIFIED**

CALLAN JMB INC~~., COLDCHAIN TECHNOLOGY~~
~~SERVICES, LLC, and~~ WAYNE WILLIAMS, in his
individual and professional capacities,

<span style="color:red">**AMENDED**</span>

**COMPLAINT**

Defendants.

---------------------------------------------------------------------X

Plaintiff, Jeffrey Appleman, CPA, ("Plaintiff" or "Mr. Appleman"), by and through his

undersigned counsel, alleges against Defendants, Callan JMB Inc. ("Callan"), ~~Coldchain~~

~~Technology Services, LLC ("Coldchain"),~~ and Wayne Williams ("Williams");

(collectively, "Defendants") as follows:

## NATURE OF THE CASE

1.      This is an action for breach of contract, ~~declaratory relief~~, defamation, <span style="color:red">and</span> tortious

interference with business relations, ~~and negligent infliction of emotional distress,~~ arising from the

Defendants' wrongful termination of Plaintiff's employment as the Chief Financial Officer of

Callan, under the false guise of "For Cause." Plaintiff further alleges that the Defendants:  (a) failed

to comply with the termination procedures and the notice to cure and cure requirements mandated

by an existing employment contract between Plaintiff and Defendant Callan, signed by Defendant

Mr. Williams; (b) failed to pay contractually owed compensation and benefits to Plaintiff, and (c)

knowingly and maliciously published false statements that Plaintiff was terminated "For Cause,"

which Defendants knew to be false, and which has had devastating consequences for Plaintiff in

terms of his personal and professional reputation, his career, his chances for seeking future gainful employment, and has resulted in foreclosed and lost employment opportunities.

2. Under Plaintiff's tenure, direction, and supervision (overseeing Defendant Callan's finance and accounting functions) – first as an outsourced fractional CFO for Defendant Callan from January, 2024 through February 2025, and then during Plaintiff's tenure as a full-time employed Chief Financial Officer (CFO) for Defendant Callan from February 6, 2025 through May 13, 2025 – Defendant Callan successfully completed an initial public offering, passed independent audits, and achieved other positive outcomes. These positive outcomes occurred due to Plaintiff's exemplary job performance as Callan's CFO — and are fundamentally inconsistent with Defendants' specious assertions in their May 13, 2025 Termination Letter that Plaintiff purportedly engaged in willful misconduct, gross negligence, or other conditions to satisfy the "Cause" / For Cause clause needed for termination of Mr. Appleman's employment, under the parties' Employment Agreement.

3. Notwithstanding Plaintiff's above-stated stellar job performance as CFO, Defendants abruptly terminated Plaintiff on May 13, 2025, effective immediately, and failed to afford to Plaintiff the contractual 30-days' notice and 30-days' cure rights required for any "Cause" / For Cause termination. Adding (public) insult to injury, the Defendants, including Williams (and, upon information and belief, Callan, at Williams' direction), publicly announced and published that Plaintiff, Jeffrey Appleman, CPA, was terminated "for cause", as falsely stated in both Defendant Callan's and Defendant Williams' press release, as well as in Defendants' SEC Form 8-K. Said publications of knowingly false statements about Plaintiff, Jeffrey Appleman, CPA, have severely harmed Mr. Appleman's standing in his profession and have caused specific lost job opportunities, including the inability to return to the specific business relationship with his former

fractional-CFO firm because of the Defendants' false "For Cause" label, which made Plaintiff, Jeffrey Appleman, "not hirable" (as was conveyed to Plaintiff by more than one professional in his field).

**THE PARTIES**

4. Plaintiff, Jeffrey Appleman, CPA, is an individual who lives in Roslyn, New York, in Nassau County. At all times relevant to this Complaint, Plaintiff performed his job duties for Defendants in a 100% remote capacity, providing his CFO-related services / employment from Nassau County, New York (mostly from his home in Roslyn, New York). Plaintiff is a licensed CPA, and has decades of experience in the accounting / CPA / CFO-related services in private industry.

5. Defendant, Callan JMB Inc., is a c-corporation incorporated in the State of Nevada, with its principal place of business at 244 Flightline Drive, in Spring Branch, Texas, and conducting business throughout the United States. Defendant Callan has no offices in New York State, and is not a resident of New York State.

6. Defendant, Coldchain Technology Services, LLC is, upon information and belief, a Texas-based limited liability company located in Spring Branch, Texas, and a subsidiary or affiliate of Callan JMB Inc., acting at all relevant times as Defendant Callan's agent and/or alter ego regarding Plaintiff's employment. Defendant Coldchain has no residency in New York State.

7. Defendants, Callan and Coldchain, were at all relevant times joint employers of Plaintiff, Jeffrey Appleman, CPA, with rights to hire and fire Plaintiff and to otherwise facilitate the terms of, and changes thereto, Plaintiff's employment with Callan and with Coldchain.

8. Defendant, Wayne Williams ("Williams") is an individual who, at all relevant times, lived / lives / resides in the State of Texas, serves as Defendant Callan's Chief Executive Officer, ~~and further served as the Executive Director of Defendant Coldchain (and is a member)~~, and personally participated in the tortious acts and breach of contract complained of herein. Defendant Williams, in conjunction with the other Texas-based Defendants, directed his and their tortious and contract-violating conduct – conduct that occurred in the State of New York, County of Nassau – where Plaintiff resides and where Plaintiff carried out his employment duties in New York State.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiff is a citizen of New York, while Defendant Callan is a citizen of Nevada and Texas, and, upon information and belief, no Shareholder ~~member~~ of Callan ~~Coldchain~~ is a citizen of New York; Defendant Williams is not a citizen of New York, thus satisfying the requirements for federal diversity jurisdiction.

10. This Court also has supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367.

11. The Court has personal jurisdiction over each and every Defendant pursuant to CPLR § 302(a) because the Defendants transacted business in New York State with Plaintiff, committed tortious acts causing injury to Plaintiff in New York; Defendants further regularly do and / or solicit business in New York, and/or expected or should reasonably have expected their actions and tortious conduct (and breach of contract) to have consequences in New York State. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District,

including the brunt of reputational and economic injury from the Defendants' publications and interference, and because Plaintiff resides in this District (County of Nassau, New York State).

## FACTUAL ALLEGATIONS

12.     From January, 2024 through February, 2025, Plaintiff, Mr. Jeffrey Appleman, CPA (an affiliate / CFO-consultant with the outsourced fractional CFO Firm, "CFO Consulting Partners, LLC") began working for Defendant Callan in a consulting capacity, serving as an outsourced fractional CFO for Defendant Callan, and reporting to / working for Defendant Williams. Plaintiff was performing his CFO-based services for the Defendants (Callan ~~Coldchain~~ and Williams) in such an exemplary manner, and with such positive job performance, that Defendants Williams (CEO of Callan) and Defendant Callan made Plaintiff a permanent job offer to serve as Defendant Callan's full-time (W-2) Chief Financial Officer (CFO), effective as of February 6, 2025.

13.     On October 1, 2024, Plaintiff and Defendants, Callan and Williams, entered into / executed a contract – a written Employment Agreement – for Plaintiff, Jeffrey Appleman, CPA, to serve as Defendant Callan's Chief Financial Officer (the "Employment Agreement") beginning in February 2025.  Thereafter on or about October 24, 2024, the parties (Plaintiff, Williams, and Callan) further entered into a written Amendment to The Employment Agreement, incorporating by reference the terms of the October 1, 2024 Employment Agreement, but amending Section 2 (making the Term of the employment contract a two-year term from the first day of the IPO of Callan, with 1-year successive periods of renewal, unless either party gave at least 90 days' notice of intention not to extend), amending Section 4 (a) (with base salary increases to $220,000 from the 1st day of the Initial Term through December 31, 2025, with compensation increasing to $250,000 annual base salary (ABS) from January 1, 2026 through December 31, 2026, and an

increase of ABS to $280,000 for year 2027, beginning on January 1); and amending Section 4 (c) (with Plaintiff's equity award increasing to 100,000 stock options (instead of 50,000) on the first day of an Initial Public Offering [IPO] of Defendant Callan, with vesting quarterly per a schedule set forth). The Employment Agreement, and the Amendment to the Employment Agreement, are contractually binding upon Plaintiff and Defendants Callan and Williams, and a true and accurate copy of both documents is attached to this Complaint as **Exhibit A.**

14.     Among other material terms, the Employment Agreement: (a) defines "Cause" for termination quite narrowly (Section 11(c); (b) requires that the Defendants must provide written notice to Plaintiff, along with giving Plaintiff a 30-day period / opportunity in which to cure any alleged / asserted performance problems or performance issues; Defendants were to follow lawful directives before any "Cause" termination (Section 11(c)(i)); (c) provides for termination other than for Cause <u>only</u> upon 30 days' written notice to Plaintiff (Section 5(d)); (d) entitles Plaintiff to payment of earned but unpaid compensation, including a prior-year bonus if termination occurs after year-end, but before the bonus is paid, and the Employment Agreement further promises Plaintiff a pro-rata current-year bonus when termination is without Cause [Sections 4(b), 5(d)(i)(2)–(3)]; (e) provides indemnification (Section 18); ~~(f) imposes confidentiality obligations, including regarding the Agreement and circumstances of separation (Section 29);~~ and (g) provides for attorneys' fees to the prevailing party in enforcement actions (Section 28).

15.     The Employment Agreement, and the written Amendment to the Employment Agreement (Exhibit A), collectively provide for equity compensation to Plaintiff. Specifically, the Employment Agreement (and its Amendment) provides Plaintiff with equity awards and stock options, including an award of 100,000 in stock in the Defendant, Callan, and further provides 100,000 stock options connected to Defendant Callan's public offering [Section 4(c)].

16. On or about February 5, 2025, while serving as CFO for Callan, Plaintiff, Jeffrey Appleman, received a Notice of Stock Option Grant from Defendant Callan, granting Plaintiff an option to purchase 15,000 shares at $4.00 per share, immediately vested, with a 10-year term (the "15,000-Share Option"). The grant is governed by Defendant Callan's 2024 Equity Incentive Plan and Stock Option Agreement (collectively, the "Option Documents").

17. From 2024 through 2025, the Plaintiff – first serving as a CFO consultant for Callan from January, 2024 through February, 2025, and then serving as Callan's full-time CFO from February 6, 2025 through May 13, 2025  – diligently performed his job duties, including leading Callan's finance, accounting, audit readiness, and public-company transition workstreams, among other tasks and executive functions as the company's CFO (Plaintiff was only paid until May 9, 2025, despite the termination notice stating that May 13, 2025 was the effective termination date).

18. Under Plaintiff's stewardship and performance as CFO for Callan, Defendant Callan successfully went public in February 2025.

19. In addition, Defendant Callan's independent auditor, RRBB Accountants & Advisors, audited the Company's financial statements and systems *for the periods when Plaintiff was performing his CFO functions for* Defendant Callan, and Defendant Callan passed these audits without any incident – all attributable to Plaintiff's stellar performance as CFO.

20. Notwithstanding Plaintiff's contributions and dedication, Defendants, inclusive of Wayne Williams and Board members at Callan, along with Wayne Williams's wife, Callan employee Donna Williams, were hostile towards Plaintiff, expressing animosity toward Plaintiff throughout his employ, and aggressively attempting to pressure him and/or coerce him into resigning in May 2025.

21. Shortly before Plaintiff's termination on May 13, 2025 – and shortly before printing their statement about Plaintiff at the time of his termination – Defendants told Plaintiff that "bad things were going to happen" (to Plaintiff) if Plaintiff refused to resign. Upon information and belief, Defendants were conveying that they would intentionally tarnish Plaintiff's business reputation with a false statement about his termination, and he would not be able to find future employment, if he did not resign from his CFO position at Callan.

22. Upon information and belief, Wayne Williams's wife, Donna Williams, as an employee of Callan, strongly disliked Plaintiff and made it clear that she resented Plaintiff. Upon further information and belief, Ms. Williams felt threatened by Plaintiff's role at Callan and resented him for his role of CFO. Upon further information and belief, Donna Williams's animosity was a substantial motivating factor in her husband's (Defendant Wayne Williams's) and Callan's decision to publish a false statement that Plaintiff was terminated "for cause" – despite Defendants' knowledge that this statement was false.

23. During Plaintiff's employment with Defendant Callan, there were a couple of Callan employees who recognized and appreciated Plaintiff's work as CFO, who also had regular interactions with Defendants, Wayne Williams and the Callan Board of Directors. Upon information and belief, immediately prior to the Defendants' publication of the aforementioned statement (with the SEC and with TipRanks), at least one of these employees conveyed to the Defendants that Plaintiff was performing satisfactorily, and thus there was no truth to any statement that Plaintiff committed "for cause" grounds for termination. Despite having this knowledge, the Defendants nonetheless chose to publish, to the SEC and to TipRanks, the false statements that: (a) there were "for cause grounds" to terminate Plaintiff (knowing there were not such grounds), and (b) the false statement that Plaintiff was fired "for cause" (when, upon strong information and

belief, Defendants knew that the true reason for their terminating Plaintiff was based on malevolent motives of retaliating against him for not resigning, acting on pre-existing resentments towards Plaintiff, and to prevent Plaintiff from reaping the rewards of future bonuses, stock vesting, and additional compensation).

24. The Defendants had a basis to know that their statements about Plaintiff being fired "for cause" were false, per the allegations in the preceding paragraph; yet, Defendants chose to disregard this truth (as believed to have been conveyed to them by at least one of their employees) with reckless disregard for their statement's veracity. Defendants further chose to publish the false statement (of Plaintiff's for cause termination) with foreseeable consequences of harm to Plaintiff's professional and personal reputation, and resultant economic damages for Plaintiff *stemming from* said published false statement.

25. Many of the alleged deficiencies later cited by Defendants in their May, 2025 termination letter, as the supposed basis for Plaintiff's unlawful termination (e.g., purported migrations and subledgers pre-dating Plaintiff's full-time CFO role; billing and AR processes controlled by personnel who did not report to Plaintiff; the absence of an inventory management module integrated with QuickBooks; and intercompany process documentation) were not the true reasons for Callan's and Williams' termination of Plaintiff. In fact, as was known by all Defendants, the performance issues falsely alleged as the basis for Mr. Appleman's termination were either: (a) legacy or known pre-existing issues that pre-date Plaintiff's employment or consulting work; (b) were  outside of Plaintiff's control, authority, or reporting chain; and/or (c) were the subject of Plaintiff's documented recommendations to senior leadership, including presentations in February 2025 identifying corrective actions and resource needs, yet, Plaintiff's recommendations for corrective actions were ignored by Defendants and by their upper management, including being

ignored by Defendant Williams (CEO of Callan).

26.     The Defendants' aforementioned alleged justifications for terminating Plaintiff, as laid out in a May 13, 2025 letter ("Termination Letter"),  were concocted by Defendants in order to purposefully and falsely attribute a "For Cause" termination to Plaintiff, thus serving as an excuse for Defendants to intentionally and wrongfully violate their Employment Agreement / Contract with Plaintiff (Exhibit A).

27.     Indeed, despite Plaintiff's performance and the Company's successful outcomes, on May 13, 2025, Defendants delivered a "Notice of Immediate Termination of Your Employment Agreement," (the aforementioned Termination Letter) which purported to terminate Plaintiff under the pretext of "For Cause," effective immediately.

28.     The Defendants' Termination Letter listed various generalized and/or pretextual criticisms of Plaintiff's job performance and service as CFO for Callan – criticisms which are – and were known by Defendants to be – factually inaccurate, unparticularized, false, taken out of context, and / or concerning matters not within Plaintiff's remit, or predating his tenure as CFO. The Defendant's May 13, 2025 Termination Letter, *followed by their immediate termination of Plaintiff,* also breached the Employment Agreement / contract, as the termination lacked the required 30-day notice prior to termination as required by the Employment Agreement. Said immediate termination further failed to present Plaintiff with a 30-day opportunity to cure any alleged performance deficiencies – as was expressly and contractually required by Section 11(c)(i) of the Employment Agreement for any purported failure by Plaintiff to perform or follow directives. (See Exhibit A, Employment Agreement).

29.  Upon information and belief, Defendants used Plaintiff to get their IPO and then subsequently discarded him under false pretenses, in order to avoid having to pay Plaintiff any

additional stocks vesting and/or any payment of additional bonuses / payouts.

~~27.~~ 30. Around the time of Plaintiff's termination, on the very same day, Defendants published and/or caused to be published a press release, and an SEC Form 8-K, each publicly stating that Plaintiff "was terminated [from his CFO position at Defendant Callan] 'for cause' in accordance with the terms of his Employment Agreement," and disseminated that statement widely (the press release and the SEC Form 8-K; herein, the "Publications").

31. Regardless of a company's general obligation to file *truthful* information about any change in an executive's position at a publicly traded company, Defendant, Callan, and its CEO, Mr. Williams, knowingly made a false statement about Plaintiff, in that the Defendants ~~including Defendant Coldchain)~~ knew that Plaintiff did not commit any "For Cause" acts to justify his termination; yet, Defendants Callan and Williams intentionally filed false statements as to the "For Cause" nature of Mr. Appleman's termination as CFO of Callan JMB, Inc.

32. The aforestated Publications intentionally and falsely asserted that Plaintiff's termination "was not related to the Company's financial or operating results or to any disagreements or concerns regarding the Company's financial or reporting practices" – thus leaving readers and the public with the clear factual impression / factual statement that Plaintiff, Jeffrey Appleman, purportedly committed any of the bad acts that are commonly known to constitute a "For Cause" termination, such as wilful misconduct, gross negligence, neglect of duties, or unlawful activity.

33. The Defendants' false "For Cause" characterization of Mr. Appleman's termination purposely and falsely conveyed / conveys to reasonable readers (and to the public) that Plaintiff engaged in serious wrongdoing, gross negligence, incompetence, or unlawful activities, as would normally warrant termination of a company's CFO "For Cause."

34. The aforesaid false statements by Defendants, combined with Mr. Willaims' and Callan's ~~and Cold chain's~~ other published statements contained in the Publications and otherwise, were / are false and misleading. ~~and were made without the contractually required procedural protections of Confidentiality~~ (see Exhibit A). Said statements were further made by Defendants based on their animosity towards Plaintiff, as frequently expressed towards him, and based upon the Defendants' following through on their stated threat that if Plaintiff did not resign, "bad things were going to happen" to him. At the very least, Defendants used their animosity towards Plaintiff to make good on their threat; i.e., that the Defendants published the knowingly false statements about Plaintiff's termination being based in For Cause, with actual malice and reckless disregard for the truth, as well as reckless disregard for the foreseeable devastation and damage that these false statements would have on Plaintiff's professional reputation, Plaintiff's career, his future job prospects, and his personal reputation within the community. Upon information and belief, Defendants further had reason to believe that the statement that Plaintiff's termination was "for cause" was not true, based upon Plaintiff's performance to date, and based upon communications from at least one other employee to Defendants, stating that Plaintiff was performing in a satisfactory manner. Yet, despite this basis to know that their published "for cause termination" was false, Defendants published the statements publicly, with the SEC and with TipRanks.

35. The Publications were accessible in this District and foreseeably and actually caused reputational and economic harm to Plaintiff in New York; to wit, Plaintiff's prior fractional CFO firm (CFO Consulting Partners) declined to rehire him because, as they stated to Plaintiff, prospective clients would Google "Jeffrey Appleman" [Plaintiff] and see he had been "fired For Cause," thereby rendering Plaintiff "not hirable." To date, Plaintiff has been seeking active employment, but, based on the Defendant's aforestated falsely published statements about him, he

has not been able to obtain gainful employment since his termination (and since the falsely published statements about Plaintiff) more than four months ago.

36. Defendants and Plaintiff's former employer, CFO Consulting Partners, LLC, had been engaged in a dispute / rift /legal fight / arbitration. Upon information and belief, the Defendants, via their direct correspondence / communications with CFO Consulting Partners, made false and fraudulent misrepresentations about Plaintiff (including his performance, his character and integrity) which were intended to harm Plaintiff's reputation in the eyes of CFO Consulting Partners LLC, and sought to make it impossible for CFO Partners LLC to rehire Plaintiff. Upon strong information and belief, Defendants knowingly sought to interfere with Plaintiff's prospective business relationship with CFO Consulting Partners as a way to further retaliate against Plaintiff (for refusing to resign), and as a way for Defendants to obstruct the business potential of CFO Consulting Partners (in retaliation for their prior legal dispute with Defendants) by taking Plaintiff out of CFO Consulting Partners, LLC's possible rehire.

37. Defendants knew and had reason to know / foresee that their aforestated act of tarnishing Plaintiff's reputation *through direct misrepresentations about Plaintiff to CFO Consulting Partners,* would, and did, interfere with the prospective (and existing) business relationship between Plaintiff and CFO Consulting Partners, and Plaintiff suffered additional economic damages (separate and apart from any damages to his professional reputation and standing in the community) in that Plaintiff lost the financial compensation from CFO Consulting Partners that would have otherwise been given to him, but for the aforementioned interference by Defendants, Callan and Williams.

38. Following the above-referenced termination, the Defendants: (a) failed and refused to pay Plaintiff all of his earned 2024 bonus under Section 4(b) of the Employment Agreement /

Contract, payable after year-end when certified by the Board; (b) failed and refused to pay Plaintiff a pro-rata 2025 bonus, per Section 5(d)(i)(3) of the Employment Agreement if Plaintiff's termination did not meet the conditions described as "for Cause" (which it did not meet); (c) failed to provide other compensation and benefits due to Plaintiff upon his termination other than for Cause, including failing to reimburse Plaintiff for certain vacation days, PTO, unreimbursed expenses; (d) failed to provide Plaintiff with outplacement services, as contractually promised per the parties' Employment Agreement; and (e) failed to honor Defendant Callans' indemnification obligations (Section 18 of the Employment Agreement / contract; annexed as Exhibit A).

39. ~~Defendants also breached the Employment Agreement's confidentiality provisions by publicly (and falsely) disclosing that Plaintiff was terminated "For Cause," rather than limiting any announcement to a neutral statement of leadership change at Defendant Callan JMB, Inc.~~

40. On June 13, 2025, the undersigned counsel wrote to Defendants demanding, *inter alia,* retraction and correction, cessation of the aforestated defamatory statements and conduct, payment of sums due under the Employment Agreement, and preservation of evidence in anticipation of litigation. The Defendants failed to remedy the above pleaded breaches of contract; nor did they remedy their tortious acts against Plaintiff.

41. To date, Defendants have intentionally refused to cease publication of their defamatory statements in the Publications and otherwise, despite having knowledge of their falsity.

42. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer substantial damages, including lost compensation and benefits (including loss of reimbursed vacation days, PTO, expenses, and the value of outplacement services), loss of past and future earnings and opportunities, reputational harm, emotional distress (including extreme embarrassment and humiliation, mental anguish, depression, and anxiety), along with expenses

14

(including attorneys' fees recoverable under Section 28 of the Employment Agreement, Exhibit A), and other consequential and special damages in an amount to be proven and awarded at trial.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT (Employment Agreement)

#### *(Against Defendant Callan ~~and Coldchain~~)*

43. Plaintiff repeats and realleges the factual allegations contained in the foregoing paragraphs as if fully set forth herein.

44. The Employment Agreement and its written Amendment (collectively, Exhibit A), signed by Plaintiff and by Defendants, are each a valid and enforceable contract between Plaintiff and his ~~joint~~ employer, Defendants Callan. ~~andColdchain.~~

45. Plaintiff fully performed his obligations under the aforesaid Employment Agreement / contract (and its written Amendment); faithfully carrying out his role and duties as the Chief Financial Officer (CFO) of Defendant, Callan JMB, Inc.

46. Defendants Callan, ~~Coldchain,~~ and Wayne Williams, each individually and collectively, have materially breached the Employment Agreement by, among other actions pleaded in the above paragraphs: (a) terminating Plaintiff "For Cause" without satisfying the definition of "Cause" in the Employment Agreement, including per Section 11(c), as was necessary for termination; (b) failing to provide Plaintiff with the mandatory written notice and 30-day opportunity to cure any alleged deficiencies in job performance (although no such deficiencies existed), as required by Section 11(c)(i) of the parties' Employment Agreement; (c) alternatively, by wrongfully terminating without Cause, effective immediately, without the required 30 days' notice under Section 5(d) of the Employment Agreement; (d) failing to pay the 2024 bonus and a pro-rata 2025 bonus as required when termination is without Cause; (e) violating Section 29's

confidentiality obligations by publicizing the asserted "for cause" rationale; and (f) failing to honor the Defendant Callan's indemnification obligations under Section 18, and attorneys' fee provisions under Section 28, of the Employment Agreement (Exhibit A; attached to this Verified Complaint).

47. As a direct and proximate result of the Defendants' above pleaded breach of the Employment Agreement (contract; Exhibit A) between Plaintiff and Defendants, the Plaintiff has suffered damages, including, without limitation, unpaid compensation, wages and bonuses, benefits, loss of stock and stock options, indemnifiable losses and fees, emotional distress, pain and suffering, and other damages to be proven at trial, but no less than $750,000.

## ~~COUNT II – DECLARATORY JUDGMENT (28 U.S.C. § 2201)~~

### ~~*(Against Defendants Callan and Coldchain)*~~

48. ~~Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs with the same force and effect as though fully set forth herein.~~

49. ~~An actual, present controversy exists regarding whether Plaintiff's job performance, as CFO of Callan, rose to the level to satisfy a "For Cause" termination under the Employment Agreement [Section 11 / 11 (c)], and the consequences flowing therefrom (including entitlement to compensation and benefits, and the inaccuracy of Defendants' public statements).~~

50. ~~Plaintiff seeks a Declaration from this Court, stating that: (a) Plaintiff, Jeffrey Appleman, CPA's termination was not "For Cause", within the meaning of the relevant provisions of the Employment Agreement; (b) that Defendants breached the Employment Agreement's notice provisions and right-to-cure requirements (prior to any termination); and (c) that Plaintiff ought to be reinstated in his position as CFO, and is entitled to the compensation, bonuses, stock and stock options, benefits (including unpaid PTO, vacation, outplacement~~

~~services and expenses), and indemnification that he would otherwise be entitled to as CFO of Defendant Callan, and (d) that Plaintiff is entitled to reimbursement of his attorneys' fees and costs expended in enforcing his rights under the Employment Agreement, as due to him under the Employment Agreement (Exhibit A), upon a termination other than for Cause.~~

## COUNT ~~III~~ II – DEFAMATION (Per Se ~~and Per Quod~~)

### *(Against All Defendants)*

48. Plaintiff repeats and realleges the factual allegations contained in each of the foregoing paragraphs, with the same force and effect as though fully set forth herein.

49. Throughout Plaintiff's tenure with Defendants, Defendants openly expressed hostility, animosity, and threats against him, attempting to strong arm Plaintiff into resigning, which Plaintiff steadfastly refused to do.

50. Notwithstanding Plaintiff's contributions and dedication to Callan, Defendants, inclusive of Wayne Williams and Board members at Callan, along with Wayne Williams's wife, Callan employee Donna Williams, were hostile towards Plaintiff, expressing animosity toward Plaintiff throughout his employment, and aggressively attempting to pressure him and/or coerce him into resigning in May 2025.

51. Shortly before Plaintiff's termination on May 13, 2025, Plaintiff was told that if he refused to resign, "bad things were going to happen" if Plaintiff did not resign. Upon information and belief, Defendants were conveying that they would intentionally tarnish Plaintiff's business reputation, and he would not be able to find future employment, if he did not resign his CFO position at Callan.

52. Upon information and belief, Wayne Williams's wife, Donna Williams, as an

employee of Callan, strongly disliked Plaintiff and had made it clear to other employees that she resented Plaintiff. Upon further information and belief, Ms. Williams felt threatened by Plaintiff's role at Callan and resented him for his role of CFO. Upon further information and belief, Donna Williams's animosity was a substantial factor / influence in her husband's (Defendant Wayne Williams's) and Callan's decision, out of spite, ill-will, and desire to harm Plaintiff, to publish a false statement that Plaintiff was terminated "for cause" – despite Defendants' knowledge that this statement was false.

53. During his employment with Defendant Callan, Plaintiff had a couple of employees who recognized and appreciated his work as CFO, who also had access to Defendants, Wayne Williams and the Callan Board of Directors. Upon information and belief, immediately prior to the Defendants' publication of the aforementioned statement (with the SEC and with TipRanks) at least one of these Callan employees conveyed to the Defendants that Plaintiff was performing satisfactorily, and that there was no truth to any conclusion or statement that Plaintiff committed "for cause" grounds for termination. Despite having this knowledge, the Defendants nonetheless chose to publish, to the SEC and to TipRanks, their false statements that (a) there was "for cause grounds" to terminate Plaintiff, and (b) the false statement that Plaintiff was fired "for cause" (when in fact, the Defendants knew / had reason to believe that the true reason for their terminating Plaintiff was based on more malevolent motives of retaliating against him for not resigning, acting out of spite and resentment towards Plaintiff, and to prevent Plaintiff from reaping the rewards of future bonuses, stock vesting, and additional compensation).

54. The Defendants had a basis to know that their statements about Plaintiff being fired "for cause" were false, per the allegations in the preceding paragraph, yet Defendants chose to disregard this truth (as conveyed to them by one of their employees) with reckless disregard for its

18

veracity.  Defendants further chose to publish the false statement of Plaintiff's for cause termination with foreseeable consequences of harm to Plaintiff's professional and personal reputation, and resultant economic damages for Plaintiff *stemming from* said published false statement.

55.    Defendants published to third parties, including via press release and SEC Form 8-K accessible in New York, the false statement that Plaintiff "was terminated 'for cause' in accordance with the terms of his Employment Agreement," and otherwise communicated false and defamatory statements impugning Plaintiff's fitness and integrity in his profession.

56.    These statements are false and defamatory on their face, were made without privilege, and constitute defamation per se as they tend to injure Plaintiff in his trade, business, or profession.

57.    Defendants made and republished the statements with at least gross negligence, and on information and belief with common-law malice (per the factual allegations set forth in the above paragraphs) and/or constitutional actual malice / out of bad faith, spite, and hostility, ((per the factual allegations set forth in the above paragraphs) — as well as with knowledge of falsity or reckless disregard for truth—warranting punitive damages.  Specifically, Defendants demonstrated their actual malice (in their knowing publication of the false statement about Plaintiff's termination being due to For Cause reasons) in part through expressing their prior animosity aimed at Plaintiff, and to  make good on their threat that "bad things were going to happen" – a threat made *immediately before the Defendants printed the false "for cause" termination statement about Plaintiff to the SEC, and to "TipRanks" – a widely disseminated online publication.*

58.    Given Plaintiff's stellar employment record that the Defendants knew about, coupled with the fact that, upon information and belief, at least one or more employees told Defendants in May, 2025 that there was not any truthful factual basis to terminate Plaintiff "for cause," the Defendants knew or should have known that there was no truth to a statement that

Plaintiff engaged in "for cause" conduct warranting termination. Yet, the Defendants published precisely such a statement about Plaintiff's "for cause" discharge from employment, with reckless disregard as to that statement's (lack of) truth, and the reputational harm that would ensue for Mr. Appleman. Defendant's motivation to mislabel Plaintiff's employment termination as "For Cause" was further designed, upon strong information and belief, to prevent certain additional stock from vesting, to escape any obligation to pay Plaintiff any future compensation, and to ensure that Plaintiff's future economic prospects were dismal.

59. Upon information and belief, the Defendants had at their disposal clear evidence (including Plaintiff's performance in helping to successfully launch Callan's IPO and to pass certain audits, among other evidence as pleaded above) that there was no factual basis to terminate Plaintiff for cause (and that his termination for cause was therefore a false representation about Plaintiff). Yet, Defendants Callan and Williams wilfully ignored such evidence (including ignoring communications from at least one other employee and documents about Plaintiff's job performance) that directly refuted the Defendants' false statement about Jeffrey Appleman's termination being based in "for cause" conduct.

60. As a direct and proximate result of the Defendants' aforesaid intentionally stated false statements, or of the false statements made with reckless disregard as to their truth, Plaintiff suffered special and general damages, including lost employment opportunities (e.g., inability to return to his prior fractional-CFO firm), reputational harm, emotional distress, and other damages in an amount to be determined at trial, but no less than $1,000,000 (One Million Dollars).

**COUNT ~~IV~~ III – TORTIOUS INTERFERENCE WITH
PROSPECTIVE BUSINESS RELATIONS**

61. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs, with the same force and effect as though fully set forth herein.

62. Plaintiff had prospective business relationships and reasonable expectancy of economic advantage with potential employers and clients, including his prior fractional-CFO firm. Plaintiff and his former employer, CFO Consulting Partners, LLC, had maintained a positive relationship following Plaintiff's prior departure, and representatives of CFO Consulting Partners, LLC had expressed an interest in rehiring Plaintiff – to the knowledge of Defendants.

63. Defendants knew of the aforestated business relationships between Plaintiff and CFO Consulting Partners, LLC, and, upon strong information and belief, knew of the expectancies that Plaintiff and CFO Consulting Partners would consummate a further business relationship after Defendants terminated Plaintiff; yet, Defendants and intentionally interfered with said business relationship by wrongful means, including (a) disseminating false and defamatory statements and otherwise disparaging Plaintiff, and (b) the additional, independent conduct by Defendants of directly communicating misrepresentations / fraudulent statements about Plaintiff to CFO Consulting Partners, LLC, known by Defendants to be untrue, with the intent and purpose of disrupting / interfering with Plaintiff's imminent business relations with CFO Consulting Partners. These fraudulent statements by Defendants to CFO Consulting Partners, upon information and belief, related to false representations that Plaintiff had engaged in gross negligence and dereliction of his job duties at Callan, among other additional, negative misrepresentations about Plaintiff's character and integrity, when Defendants knew these accusations / misstatements to be false.

64. Upon information and belief, Defendants and Plaintiff's prior fractional CFO firm were engaged in a legal dispute prior to Plaintiff's termination, and the Defendants, upon further

information and belief, intentionally and improperly communicated false, misleading and/or disparaging / fraudulent statements (about Plaintiff's job performance, his trustworthiness and character, and other topics) directly to CFO Consulting Partners LLC. Defendants' fraudulent communications about Plaintiff to CFO Consulting Partners were known by the Defendants to be false, were not made for any legitimate purpose, but rather, were motivated by malice and retaliation (against Plaintiff for refusing to resign, and against CFO Consulting Partners for initiating prior legal action against Defendants), and/or were based on the Defendants' intention to harm Plaintiff.

65. As a direct and proximate result of Defendants' aforestated false and disparaging / fraudulent statements about Plaintiff *made directly to CFO Consulting Partners* – CFO Consulting Partners declined to pursue a business relationship with Plaintiff, including failing to re-hire Plaintiff as would have otherwise occurred.

66. Defendants aforementioned conduct constituted intentional interference with prospective business relations with CFO Consulting Partners through wrongful means, including defamation, and the independent means of knowingly making fraudulent / false misrepresentation to the third party (CFO Consulting Partners, LLC), and other bad faith conduct by Defendants.

67. Defendants' conduct was undertaken with malice and without justification, and directly caused the loss of those expectancies and other economic harm to Plaintiff.

68. As a result of the aforementioned conduct / tortious interference with business relations by Defendants, Plaintiff suffered additional damages (beyond the damage to his personal and professional reputation by the aforementioned fraudulent / derogatory statements about him) in that Plaintiff suffered a loss of anticipated work and income from CFO Consulting Partners, LLC, including a loss of compensation from CFO Consulting Partners, and the loss of an opportunity for

advancement at CFO Consulting Partners, LLC, which would have occurred but for the interference by Defendants with said potential / existing business relationship.

69. Plaintiff is entitled to recover damages, including consequential and punitive damages in an amount to be determined at trial, but no less than $1,000,000 (One Million Dollars).

**COUNT V – BREACH OF CONTRACT (Confidentiality / Non-Disclosure)**

***(Against Defendants Callan and Coldchain)***

54. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

55. Section 29 of the Employment Agreement, which is a binding contract between the parties, imposes confidentiality obligations on Defendants Callan and Coldchain with respect to the Agreement and related matters.

56. By publicizing in the press that Plaintiff was terminated "For Cause" and by otherwise disclosing non-required, harmful information in external communications, Defendants Callan and Coldchain materially breached their confidentiality obligations to the Plaintiff, and thus, breached the aforesaid contract / Employment Agreement.

57. Plaintiff suffered direct damages – including financial harm, emotional distress, and equitable harm – as a direct and proximate result of the aforestated breach of contract by Defendants Callan and Coldchain .

58. Plaintiff seeks damages from Defendants Callan and Coldchain for the aforestated breach of contract, including the equitable relief of seeking a retraction by Defendants Callan and Coldchain of the confidentially protected statements related to Mr. Appleman's termination, while

23

further seeking economic damages in an amount to be determined at trial, but no less than $750,000 (Seven Hundred and Fifty Thousand Dollars).

## COUNT ~~V~~**IV** – EQUITY-RELATED RELIEF (Breach of Contract)

### *(Against Defendants Callan)*

70.    Plaintiff repeats and realleges the factual allegations set forth in the foregoing paragraphs, with the same force and effect as though fully set forth herein .

71.    Under Section 4(c) of the Employment Agreement, Plaintiff was to receive certain equity awards (including 100,000 stock options vesting over 24 months). Additionally, Plaintiff received a separate 15,000-share immediately vested stock option grant on February 5, 2025.

72.    On information and belief, Defendants have failed to deliver all equity promised under the Employment Agreement and/or have sought to wrongfully impair, cancel, or restrict Plaintiff's vested equity rights based on the pretextual "for cause" termination.

73.    Plaintiff seeks damages for breach of Section 4(c) and/or a declaration that his vested equity rights (including the 15,000-share option) remain valid and exercisable in accordance with their terms, unaffected by Defendants' wrongful "for cause" designation, and damages in an amount not less than $500,000 (Five Hundred Thousand Dollars).

## ~~COUNT VII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS~~

### *~~(Against All Defendants)~~*

~~74. Plaintiff incorporates by reference and realleges the factual allegations contained in the preceding paragraphs, with the same force and effect as though fully set forth herein.~~

75. The Defendants owed a duty of care to Plaintiff not to jeopardize Plaintiff's well-being, nor to endanger Plaintiff's sense of safety and freedom from emotional or physical harm.

76. The Defendants, through the above acts and conduct of published statements as pleaded in the preceding paragraphs above, engaged in negligent, gross and outrageous misconduct, and malicious harm aimed at Plaintiff, Jeffrey Appleman, CPA, as per the specific examples of gross actions that Defendants took against Plaintiff, as set forth in paragraphs 1 through 64, above.

77. Defendants, through their individual and cumulative outrageous and extreme conduct, misconduct, and abuse of Plaintiff (as pleaded above), took their course of outrageous conduct and harassment of Plaintiff in public fashion, with failure to exercise reasonable care as to Plaintiff's well-being, and with negligence / lack of proper care, with the foreseeable result that the Defendants' malicious actions, abuse, and extreme misconduct towards Plaintiff would likely cause Plaintiff to suffer emotional distress, public humiliation, extreme embarrassment, depression, anxiety, insomnia, and other physical symptoms as manifestation of emotional harm.

78. The Defendants' actions (as pleaded with great specificity in paragraphs 1 through 66, above) were such that Defendants were aware that their actions were highly likely to cause Plaintiff to suffer from severe emotional distress, yet the Defendants proceeded to take such actions, and to engage in such extreme and outrageous conduct towards Plaintiff nonetheless.

79. As a direct, proximate, and highly foreseeable result of Defendants' aforestated extreme and outrageous misconduct / actions / abuse of Plaintiff, the Plaintiff did suffer extremely severe

and traumatic emotional distress, and continues to suffer such severe and traumatic emotional distress, including but not limited to: severe anxiety, severe mental anguish, extreme embarrassment, shame and public humiliation, anxiety, panic attacks, insomnia, depression, physical somatized pain, loss of appetite, and trauma. Accordingly, Plaintiff is entitled to compensatory / economic damages from the Defendants, in an amount to be determined at trial, but no less than $1,000,000 Dollars).

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants, jointly and severally as applicable, as follows:

A. A declaration that Plaintiff's termination was not "For Cause" under the Employment Agreement, that Defendants breached the Employment Agreement's (Contract's) Notice and Cure provisions, and that Plaintiff is entitled to all compensation, bonuses, benefits, indemnification, and other rights triggered by a termination other than for Cause;

B. A. Compensatory damages for breach of contract, including but not limited to: (i) Plaintiff's earned 2024 bonus; (ii) a pro-rata 2025 bonus; (iii) any unpaid salary, accrued but unpaid PTO, COBRA reimbursements, vacation days, stock options, outplacement services, and other benefits due; (iv) indemnification amounts due under Section 18; and (v) attorneys' fees, costs, and expenses under Section 28;

C. B. Compensatory damages for defamation and tortious interference with business relations, including for reputational harm, lost earnings and opportunities, emotional distress, and lost economic value from the prospective business relations that were interfered with by Defendants, in an amount to be determined at trial;

26

D. C. Punitive damages on the defamation and tortious interference claims;

E. D. Equity-related relief, including damages for breach of Section 4(c) of the Employment Agreement; ~~and/or (ii) a declaration and order confirming Plaintiff's vested equity rights (including, without limitation, his 15,000-share option / 100,000 stock options grant) remain valid and exercisable unaffected by Defendants' wrongful termination designation;~~

F. E. Monetary damages upon each of the aforestated Counts I through IV, ~~VII,~~ for the dollar amounts stated in each of the above Counts (or more, if determined to be higher at trial), in an amount to be determined at trial, but for no less than the sum of $5,000,000 (Five Million Dollars).

G. F. Pre- and post-judgment interest as allowed by law;

H. G. Costs of suit, expenses and attorneys' fees; and

I. H. Such other and further relief as the Court deems just and proper.

Dated: New York, New York
May 5, 2026

SARVER LAW FIRM, PLLC

By: *Eric M. Sarver Esq*
Eric M. Sarver, Esq. (ES-4454)
*Attorneys for Plaintiff*
Sarver Law Firm, PLLC
106 West 32nd Street, Suite 147
New York, New York 10001
Tel: (917) 930-8684
Fax: (212) 409-8529
Email: ems@sarverlawfirm.com

TO:

Andrew Zinman, Esq.
Sichenzia Ross Ference Carmel LLP *Attorneys For Defendants.*
1185 Avenue of the Americas, 31st floor
New York, NY 10036
Tel: (212) 930-9700
Fax: (212) 930-9725
Email: azinman@srfc.law

# EXHIBIT A

EX-10.7 13 ex10-7.htm

**Exhibit 10.7**

**EMPLOYMENT AGREEMENT**

This Employment Agreement, dated as of October 1, 2024 (this **"Agreement"**), is made and entered into by and between Callan JMB Inc., a Nevada corporation (the **"Company"**), and Jeff Appleman (the **"Executive" and together with the Company, the** "**Parties**" **and individually a** "**Party**")**.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in <u>Section 11</u>.

**RECITALS**

**WHEREAS**, subject to the terms and conditions hereinafter set forth, Company wishes to employ Executive as its Chief Financial Officer and Executive wishes to be employed by Company as its Chief Financial Officer.

**NOW, THEREFORE**, in consideration of the foregoing premises and the mutual promises, terms, provisions, and conditions set forth in this Agreement, the adequacy and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

**AGREEMENT**

1. <u>Employment</u>. Subject to the terms and conditions set forth in this Agreement, Company hereby offers, and Executive hereby accepts employment with Company, as of the date first above written (the "**Effective Date**").

2. <u>Term</u>. The Executive's employment hereunder shall be effective as of the 1st day of the Initial Public Offering and shall continue for two year (the "**Initial Term**"), unless terminated earlier pursuant to the terms of this Agreement; *provided that*, on expiry of such Initial Term, the Agreement shall be deemed to be automatically extended, upon the same terms and conditions, for successive periods of one (1) years (each "**Renewal Term**"), unless either Party provides written notice of its intention not to extend the term of the Agreement at least 90 days prior to the applicable renewal date. The Initial Term and each Renewal Term are hereinafter referred to as the "**Term**."

3. <u>Capacity and Performance</u>.

(a) During the Term, the Executive shall be employed by Company on a full-time basis as its Chief Financial Officer. Executive shall perform such duties and responsibilities as directed by the Board of Directors of the Company (the "**Board**"), consistent with Executive's position on behalf of Company.

(b) Executive shall devote his full business time, attention, skill, and best efforts to the performance of his duties under this Agreement and shall not engage in any other business or occupation during the Term, including, without limitation, any activity that: (x) conflicts with the interests of the Company or any other member of the Company Group, (y) interferes with the proper and efficient performance of Executive's duties for the Company, or (z) interferes with Executive's exercise of judgment in the Company's best interests. Notwithstanding the foregoing, nothing herein shall preclude Executive from: (i) serving, with the prior written consent of the Board, as a member of the Board of Directors or Advisory Board (or the equivalent in the case of a non-corporate entity) of a noncompeting for-profit business and one or more charitable organizations, (ii) engaging in charitable activities and community affairs, and (iii) managing Executive's personal investments and affairs; provided, however, that the activities set out in clauses (i), (ii), and (iii) shall be limited by Executive so as not to materially interfere, individually or in the aggregate, with the performance of his duties and responsibilities hereunder.

(c) Executive's employment with Company shall be exclusive with respect to the business of Company. Accordingly, during the Term, Executive shall devote Executive's full business time and Executive's best efforts, business judgment, skill and knowledge to the advancement of the business and interests of Company and the discharge of Executive's duties and responsibilities hereunder, except for permitted vacation (and other paid time off) periods, reasonable periods of illness or incapacity, and reasonable and customary time spent on civic, charitable and religious activities, in each case such activities shall not interfere in any material respect with Executive's duties and responsibilities hereunder.

(d)  During the Term, the Executive will report directly to the Chief Executive Officer.

(e)  On the Effective Date, the Board shall appoint Executive as the Chief Financial Officer.

(f)  Executive shall be employed to perform his duties under this Agreement at the primary office location of Company, or at such other location or locations as may be mutually agreeable to Executive and Company. Notwithstanding this, it is expected that the Executive shall be required to travel a reasonable amount of time in the performance of his duties under this Agreement.

4.  Compensation and Benefits.

(a)  Base Salary. For services performed by Executive under this Agreement, Company shall pay Executive an annual base salary of $220,000 from Effective Date through December 31, 2025, $250,000 from January 1, 2026 through December 31, 2026, and $280,000 from January 1, 2027 through December 31, 2027, minus applicable withholdings and deductions, payable at the same times as salaries are payable to other executives of Company (the "**Base Salary**"). During the Term, the Base Salary shall be reviewed by the Compensation Committee and/or the Board each year, and the Board may, from time to time, increase such Base Salary and any reference to "**Base Salary**" herein shall refer to such Base Salary, as increased.

(b)  Annual Bonus. For each fiscal year of the Company during the Term, the Company shall afford Executive the opportunity to earn an incentive bonus ("**Bonus**") as described in this Section 4(b). The aggregate target Bonus payable to Executive under such program(s) shall equal thirty percent (30%) of the Base Salary for such fiscal year and shall be payable to the extent the applicable performance goals are achieved (which goals and payment matrices shall be set by the Compensation Committee of the Board in its discretion). The amount of the Bonus will be determined by certification by the Board that the applicable goals have been achieved, and the Board shall promptly provide such certification following the achievement of the applicable goals. The amount payable under this Section 4(b) shall be paid by the seventh (7th) day following the approval of the annual audited financial statements by the Board or its audit committee, as applicable, for the calendar year in which the Bonus is earned or if later, the fifteenth (15th) day of the third month following the end of the Company's fiscal year in which the Bonus is earned.

(c)  Equity Awards. During the Term, the Executive shall be entitled to receive equity awards either now or in the future, on terms and conditions similar to those applicable to other executive officers of the Company generally, inside or outside of any established equity plan. The amount and terms of the long-term incentive awards awarded to the

Executive shall be set by the Compensation Committee in its discretion, except on the 1st day of the Initial Public Offering of the Company, the Executive shall be awarded 50,000 shares of the Company's common stock. In addition, the Executive shall be awarded an additional 50,000 stock options (the "**Options**") with an exercise price equal to the price of the Company's common stock as set forth in the final Registration Statement for the Offering, vesting quarterly (every 3 months) over twenty-four (24) months with the first installment vesting three (3) months after the closing of the Company's currently contemplated firm commitment underwritten public offering (the "**Offering**") pursuant to a registration statement on Form S-1 (the "**Registration Statement**"). The Options shall be governed by and subject to the Company's employee stock option plan in place from time to time.

(d) Other Executive Benefits. During the Term, the Executive shall be entitled to participate in all executive benefit plans, including health and 401(k) plans, from time to time generally in effect for Company's executives (collectively, "**Benefit Plans**"). Such participation and receipt of benefits under any such Benefit Plans shall be on the same terms (including cost-sharing between Company and Executive) as are applicable to other Company executives and shall be subject to the terms of the applicable plan documents and generally applicable Company policies. The Company may alter, modify, add to or delete the Benefit Plans in a manner nondiscriminatory to Executive at any time in accordance with applicable plan rules.

(e) Vacation. The Executive shall be entitled to an annual vacation of 20 days plus ten established holiday days per full calendar year of his employment with the Company hereunder. Any unused vacation in one accrued calendar year may not be carried over to any subsequent calendar year.

(f) Business and Travel Expenses. Company shall pay or reimburse Executive for all reasonable, customary and necessary business expenses (including cell phone, travel, lodging, networking, and entertainment expenses) which are correctly documented and incurred or paid by Executive in the performance of Executive's duties and responsibilities hereunder, subject to the rules, regulations, and procedures of Company and in effect from time to time.

5.  Termination of Employment; Severance Benefits. Notwithstanding the provisions of Section 2, the Executive's employment hereunder shall terminate under the following circumstances:

(a)  Death. If Executive dies during the Term, Executive's employment hereunder shall immediately and automatically terminate. In such event, Company shall pay to Executive's designated beneficiary or, if no beneficiary has been selected by Executive, to Executive's estate, the Final Compensation. Company shall have no further obligation hereunder to Executive, Executive's beneficiary, or Executive's estate upon the termination of Executive's employment under this Section 5(a) including, specifically, that the provisions of Section 5(d) shall not apply.

(b)  Disability.

(i)  Company may terminate Executive's employment hereunder due to Executive's Disability during the Term by giving Executive thirty (30) days' written notice of its intent to terminate, but in no event shall such termination be effective prior to the expiration of the time periods in the definition of "**Disability**." Notwithstanding the foregoing, Company will, after engaging in an interactive process with Executive to discern whether reasonable accommodation(s) can be provided without undue hardship upon Company, offer Executive reasonable accommodation(s) to enable Executive to perform the essential functions of Executive's position to the extent required by applicable law (if any) before terminating Executive's employment hereunder. Executive may decline such reasonable accommodation, in which case Executive's employment hereunder will terminate as provided in this subsection.

(ii)  In the event of such termination for Disability, Executive will receive Executive's Final Compensation. Company shall have no further obligation hereunder to Executive upon termination of Executive's employment under this Section 5(d), including, specifically, that the provisions of Section 5(d) shall not apply.

(iii) Subject to Executive's rights under the Family and Medical Leave Act (**FMLA**) and the Americans with Disabilities Act (ADA), Company may designate another Executive to act in Executive's place during any period of Executive's Disability during which Executive is unable to perform the essential functions of Executive's position with or without reasonable accommodation. Notwithstanding any such designation, Executive shall continue to receive the Base Salary in accordance with Section 4(a) and coverage under the Benefit Plans in accordance with Section 4(b), to the extent permitted by the then-current terms of the applicable benefit plans and

as provided under the FMLA, if applicable, until the earliest to occur of: (A) the end of the Term, (B) Executive becomes eligible for disability income benefits under Company's disability income plan, or (C) the termination of Executive's employment.

(iv) While receiving disability income payments under Company's disability income plan (if applicable), Company will continue to pay to Executive Executive's Base Salary under Section 4(a), but may offset any such disability income payments Executive receives against the Base Salary payments. Executive will also continue to participate in the Benefit Plans in accordance with Section 4(b) and the terms of such Benefit Plans, until the end of the Term or until the termination of Executive's employment, whichever occurs first.

(v) If any question arises as to whether during any period Executive has a Disability as defined herein, Executive may, and at the request of Company shall, submit to a medical examination by a qualified, unbiased physician selected by Company and reasonably acceptable to Executive or Executive's duly appointed guardian, if any, to determine whether Executive has a Disability and such determination shall for the purposes of this Agreement be conclusive of the issue.

(c) By Company for Cause. Company may terminate Executive's employment hereunder for Cause, as defined in Section 11(c), at any time upon notice to Executive setting forth in reasonable detail the nature of such Cause. Upon the giving of notice of termination of Executive's employment hereunder for Cause, Executive will receive Executive's Final Compensation. Except as provided herein, Company will have no further obligation to Executive upon termination of Executive's employment under this Section 5(c). Any notice of termination of Executive's employment hereunder for Cause, or any notice to Executive regarding any event, condition or circumstance that, if not cured, if applicable, in accordance with the above, could give rise to a termination of Executive's employment hereunder for Cause, shall set forth in detail the applicable event(s), condition(s) or circumstance(s) constituting reason(s) or potential reason(s) for such termination hereunder.

(d) By Company Other than for Cause or by Executive for Good Reason. Company may terminate Executive's employment hereunder other than for Cause at any time upon thirty (30) days' written notice to Executive and Executive may terminate Executive's employment hereunder for Good Reason at any time upon thirty (30) days' written notice to Company.

(i) In the event of a termination of Executive's employment under this Section 5(d), in addition to the Final Compensation, Executive shall receive:

(1)  payment of applicable Base Salary for the period of (a) six (6) months from the date of termination, when the said termination is effected after first anniversary of the Effective Date, or (b) twelve (12) months from the date of termination, when the said termination is effected after second anniversary of the Effective Date; payable in accordance with the Company's regular payroll practices, less applicable withholdings, commencing at the conclusion of the period set forth in Section 5(d)(iii); and

(2)  if the date of termination occurs after the end of a calendar year but prior to the date on which a Bonus is paid under Section 4(b), payment of such Bonus as determined under Section 4(b) shall be at the time proscribed by Section 4(b); and

(3)  payment of a *pro-rata* portion of the amount of Executive's Bonus for the year in which termination occurs that would have been payable based on actual performance determined under the terms of the Bonus as then in effect for such year, with such *pro-rata* portion calculated by multiplying the amount of such bonus for the year in which such termination occurs (as determined by the Board based on actual performance for such year) by a number: (x) the numerator of which is the number of days worked by Executive during the year of such termination, and (y) the denominator of which is three hundred sixty-five (365), with such payment to be made after the determination of the Bonus pursuant to Section 4(b).

(ii)  If the Executive timely and properly elects health continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 (**"COBRA"**), the Company shall reimburse the Executive for the monthly COBRA premium paid by the Executive for himself and his dependents. Such reimbursement shall be paid to the Executive on the 1st day of the month immediately following the month in which the Executive timely remits the premium payment. The Executive shall be eligible to receive such reimbursement until the earliest of:

(1)  the first anniversary of the date of termination (provided, however, if the date of termination is after the first anniversary of the Effective Date, the period pursuant to this subsection (1) shall be six (6) months after the date of termination);

(2)  the date the Executive is no longer eligible to receive COBRA continuation coverage; and

(3)  the date on which the Executive receives substantially similar coverage from another employer or other source.

(iii) Any obligation of Company to Executive under this <u>Section 5(d)</u> (other than for the Final Compensation or for benefits required by law) is conditioned upon Executive's execution and delivery to Company and the expiration of all applicable statutory revocation periods of a release of claims in the form attached hereto as

<u>Exhibit A</u> (the **"Executive Release"**), provided, that the terms of such Executive Release shall be subject to modification to the extent necessary to comply with: (a) the fact that Company is simultaneously terminating more than one executive as part of a group termination decision or (b) changes in applicable law, if any, occurring after the date hereof, and prior to the date such Executive Release is executed.

(e)  <u>By Executive Other than for Good Reason</u>. Executive may terminate Executive's employment hereunder other than for Good Reason upon thirty (30) days' written notice to Company; <u>provided</u>, that Company may, in its sole and absolute discretion, by written notice accelerate such date of termination. In the event of a termination of Executive's employment under this <u>Section 5(e)</u>, Executive will receive the Final Compensation. Company shall have no further obligation hereunder to Executive upon termination of Executive's employment under this <u>Section 5(e)</u>.

(f)  <u>Change in Control Severance</u>. Except as otherwise set forth herein, if a Change in Control occurs, and on, or at any time during the 24 months following, the Change in Control, (i) the Company terminates Executive's employment for any reason other than Cause or Disability, or (ii) Executive terminates Executive's employment for Good Reason, Executive shall be entitled to the following benefits:

(i)  The Company shall pay Executive, in a lump sum within 60 days following termination of Executive's employment, severance equal to two times the sum of Executive's Base Salary and Bonus (the full, non-prorated Bonus for the year of termination assuming attainment of the targeted performance goals at the 100% payout level).

(ii)  Executive also shall be entitled to receive any and all vested benefits accrued under any other incentive plans to the date of termination of employment, the amount, entitlement to, form, and time of payment of such benefits to be determined by the terms of such incentive plans. For purposes of calculating Executive's benefits under the incentive plans, Executive's employment shall be deemed to have terminated under circumstances that have the most favorable result for Executive under the applicable incentive plan.

(iii)  If, upon the date of termination of Executive's employment, Executive holds any awards with respect to securities of the Company, (i) all such awards that are restricted stock units/options shall immediately become vested and exercisable upon such date and shall be exercisable thereafter until the <u>earlier</u> of the third (3rd) year anniversary of Executive's termination of employment or the expiration of the full term of the restricted stock units/options; (ii) all restrictions on any such awards of restricted stock, restricted stock units or other awards shall terminate or lapse, and all such awards of restricted stock, restricted stock units or other awards shall be vested and payable; and (iii) all performance goals applicable to any such performance-based awards that are "in cycle" (i.e., the performance period is not yet complete) shall be deemed satisfied at the "target" level (assuming 100% payout), and (iv) all such awards shall be paid in accordance with the terms of the applicable award agreement. The provisions of this subsection shall be subject (and defer) to the provisions of any incentive plan, award agreement or other agreement as it relates to an individual award

to the extent such provisions provide treatment that is more favorable to Executive than the treatment described in this subsection and such more favorable provisions in such incentive plan, award agreement or other agreement shall supersede any inconsistent or contrary provision of this subsection. All of Executive's awards with respect to securities of the Company that are outstanding upon the date of termination of Executive's employment shall continue to be subject to, and enjoy the benefits and protections under, the terms of the incentive plan, the award agreement and any other plan, agreement, policy or other arrangement to which such awards are subject as of the effective date of Executive's participation, including any employment security agreement or other written compensation arrangement (even if the remaining terms thereof are waived), without application of this subsection.

(iv) Executive and Executive's spouse and other qualified beneficiaries shall be eligible for continued coverage as follows:

(A) If the Executive, Executive's spouse and/or Executive's other qualified beneficiaries are enrolled under a group health plan as defined by COBRA, on the date of termination of Executive's employment, Executive, Executive's spouse and/or Executive's qualified beneficiaries may elect to continue such coverage under COBRA, except that the maximum coverage period shall be extended to no less than the Severance Period (but no more than 1 year) for that Executive, unless, after electing COBRA, the individual attains age 65 and becomes eligible for Medicare, in which case COBRA shall end for that individual. If Executive, Executive's spouse and/or Executive's other qualified beneficiaries elect COBRA coverage, the Company shall pay a portion of the COBRA costs for the Severance Period for that Executive (subject to any earlier termination of COBRA). The portion to be paid by the Company shall equal the amount necessary so that the total of the COBRA costs paid by Executive is equal to the costs that would have been paid by Executive for such coverage as an active employee immediately prior to termination of Executive's employment or, if less, prior to the Change in Control. The cost of COBRA coverage paid by the Company may be taxable income to the Executive and reported on Executive's Internal Revenue Service Form W-2. Executive, Executive's spouse and/or Executive's qualified beneficiaries may continue coverage under COBRA after the Severance Period for that Executive, provided they pay the full COBRA costs and COBRA otherwise remains available.

(B) The benefits and/or extended coverage provided under this subsection shall cease prior to the date such benefits and/or extended coverage would otherwise end under subsection if and when Executive (A) obtains employment with another employer during the Severance Period and becomes eligible for coverage under any

substantially similar plan provided by his/her new employer or (B) fails to pay the required active employee portion of the cost of coverage provided under this subsection in the time and manner specified by the Company or its designee.

(v)  Executive shall be entitled to payment for any accrued but unused vacation in accordance with the Company's policy in effect at the time of termination of Executive's employment, in a lump sum within 60 days following such termination. Executive shall not be entitled to receive any payments or other compensation attributable to vacation that would have been earned had Executive's employment continued during the Severance Period, and Executive waives any right to receive any such compensation.

(vi)  The Company shall, at the Company's expense, provide Executive with 12 months of executive outplacement services with a professional outplacement firm selected by the Company; provided that Executive must use the outplacement services by no later than the end of the second calendar year following the calendar year in which the termination of Executive's employment occurred and the total cost of such outplacement services must not exceed any per individual cap on such amounts in the Company's agreement with the professional outplacement firm selected by the Company.

(vii)Executive shall not be entitled to reimbursement for any other fringe benefits or perquisite payments during the Severance Period, including but not limited to dues and expenses related to club memberships, automobile, cell phone, expenses for professional services, executive physicals, and other similar perquisites.

(viii)  The Company shall pay as incurred (within ten calendar days following the Company's receipt of an invoice from Executive) Executive's out-of-pocket expenses, including attorneys' fees, incurred by Executive at any time from the date of this Agreement through Executive's remaining lifetime or, if longer, the statute of limitations for contract claims under applicable state law, in connection with any action taken to enforce the Executive's rights under this Agreement or construe or determine the validity of this Agreement or otherwise in connection herewith, including any claim or legal action or proceeding, whether brought by Executive or the Company or another party; provided, Executive must be successful through judgment in his/her favor with respect to such action in order to recover fees under this Section 5(f)(viii); provided further, that Executive shall have submitted an invoice for such fees and expenses at least fifteen calendar days before the end of the calendar year next following the calendar year in which such fees and expenses were incurred. The amount of such legal fees and expenses that the Company is obligated to pay in any given calendar year shall not affect the legal fees and expenses that the Company is obligated to pay in any other calendar year, and Executive's right to have the Company pay such legal fees and expenses may not be liquidated or exchanged for any other benefit. The Company's obligation to pay Executive's eligible legal fees and expenses under this Section 5(f)(viii) shall not be conditioned upon the termination of Executive's employment.

6.    <u>Effect of Termination</u>.

(a)   Upon termination of Executive's employment hereunder and subject to the provisions of <u>Section 5</u> and <u>Section 6(c)</u>, Company's entire obligation to Executive shall be payment of Final Compensation.

(b)   In connection with the cessation of Executive's service as Chief Financial Officer of Company for any reason, except as may otherwise be requested by the Company in writing and agreed upon in writing by Executive, Executive shall be deemed to have resigned from any and all directorships, committee memberships, and any other positions Executive holds with the Company or any other member of the Company Group. Executive hereby agrees that no further action is required by Executive or any of the preceding to make the transitions and resignations provided for in this paragraph effective, but Executive nonetheless agrees to execute any documentation Company reasonably requests at the time to confirm it and to not reassume any such service or position without the written consent of Company.

(c)   Except as otherwise required by Consolidated Omnibus Budget Reconciliation Act or any similar federal or state law, benefits shall continue or terminate pursuant to the terms of the applicable benefit plan or agreement, without regard to any continuation of Base Salary or other payment to Executive following such date of termination.

(d)   The provisions of this <u>Section 6</u> shall apply to any termination of employment. Provisions of this Agreement will survive any termination if so provided herein or if necessary or desirable to accomplish the purposes of other surviving provisions, including, without limitation, the obligations of Executive under <u>Section 7</u> through <u>Section 9</u>.

(e)   Any termination of Executive's employment with Company under this Agreement shall automatically be deemed to be simultaneous resignation of all other positions and titles (including any director positions) that Executive holds with Company and any Affiliate or subsidiary thereof. This <u>Section 6(e)</u> shall constitute a resignation notice for such purposes.

(f)   Upon termination of the Executive's employment or upon the Company's request at any other time, the Executive will deliver to the Company all of the Company's property, equipment, and documents, together with all copies thereof, and any other material containing or disclosing any Intellectual Property or Confidential Information and certify in writing that the Executive has fully complied with the foregoing obligation. The Executive agrees that the Executive will not copy, delete, or alter any Company computer equipment information before the Executive returns it to the Company. In addition, if the Executive has used any personal computer, server, or email system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, the Executive agrees to provide the Company with a computer-

usable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and the Executive agrees to provide the Company access to the Executive's system as reasonably requested to verify that the necessary copying and/or deletion is completed.

7.  <u>Confidential Information</u>.

(a)  Executive acknowledges that Company continually develops Confidential Information, that Executive may develop Confidential Information for Company and that Executive may learn of Confidential Information during the course of employment with Company. Executive will comply with the policies and procedures of Company for protecting Confidential Information and shall not disclose to any Person or use, other than as required by applicable law, regulation or process or for the proper performance of Executive's duties and responsibilities to Company, any Confidential Information obtained by Executive incidental to Executive's employment or other association with Company. Executive understands that this restriction shall continue to apply after Executive's employment terminates, regardless of the reason for such termination.

(b)  Notwithstanding anything contained in this <u>Section 7</u> to the contrary, nothing contained herein shall prevent Executive from disclosing any Confidential Information required by law, subpoena, court order or other legal processes to be disclosed; provided, that, Executive shall give prompt written notice to Company of such requirement, disclose no more information than is so required and cooperate, at Company's cost and expense, with any attempt by Company to obtain a protective order or similar treatment with respect to such information.

(c)  Pursuant to the Defend Trade Secrets Act of 2016, Executive understands that:

(i)  Executive may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding; and

(ii)  if Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Executive may disclose the employer's trade secrets to Executive's attorney and use the trade secret information in the court proceeding if Executive files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

8.  <u>Assignment of Rights to Intellectual Property</u>. Executive shall promptly and fully disclose to Company all Intellectual Property developed for the benefit of Company in the course of Executive's employment by Company. Executive hereby assigns and agrees to assign to Company (or as otherwise directed by Company) Executive's full right, title, and interest in and to all such Intellectual Property. Executive agrees to execute any and all applications for domestic and foreign patents, copyrights or other proprietary rights and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by Company (at Company's expense) to assign to Company the Intellectual Property developed for the benefit of Company in the course of Executive's employment by Company and to permit Company to enforce any patents, copyrights or other proprietary rights to the Intellectual Property. Executive will not charge Company for time spent in complying with these obligations. All copyrightable works that Executive creates developed for the benefit of Company in the course of Executive's employment by Company shall be considered **"work made for hire."**

9.  <u>Restricted Activities</u>. Executive agrees that the restrictions on Executive's activities during and after Executive's employment set forth below are necessary to protect the goodwill, Confidential Information and other legitimate interests of Company and its successors and assigns:

(a)  During the Term of this Agreement and during the Restricted Period following termination of employment, Executive will not, without the prior written consent of Company, directly or indirectly, and whether as principal or investor or as an Executive, officer, director, manager, partner, consultant, agent, or otherwise, alone or in association with any other Person, firm, corporation, or other business organization, engage or otherwise become involved in a Competing Business (as defined below) in any country in

which the Company conducted business during the Term; provided, however, that the provisions of this Section 9 shall apply solely to those activities of a Competing Business which are congruent with those activities with which Executive was personally involved or for which Executive was responsible while employed by the Company or its subsidiaries during the twelve (12) month period preceding termination of Executive's employment. This Section 9 will not be violated, however, by Executive's investment of up to $500,000 in the aggregate in one or more publicly-traded companies that engage in a Competing Business. **"Competing Business"** means a business or enterprise (other than Company or its subsidiaries) that directly competes with the business of the Company as currently conducted or otherwise conducted by the Company during the Term (the **"Restricted Activities"**). **"Restricted Period"** means twenty-four (24) months.

(b)    During the Term of this Agreement and during the Restricted Period (as defined above), Executive will not engage in any Wrongful Solicitation. A **"Wrongful Solicitation"** shall be deemed to occur when Executive directly or indirectly (except in the course of Executive's employment with Company), for the purpose of conducting or engaging in a Competing Business, calls upon, solicits, advises or otherwise does, or attempts to do, business with any Person who is, or was, during the then most recent 12-month period, a customer of Company or any of its subsidiaries, or takes away or interferes or attempts to take away or interfere with any custom, trade, business, patronage or affairs of Company or any of its subsidiaries, or hires or attempts to hire any Person who is, or was during the most recent 12-month period, an Executive, officer, representative or agent of Company or any of its subsidiaries, or solicits, induces, or attempts to solicit or induce any Person who is an Executive, officer, representative or agent of Company or any of its subsidiaries to leave the employ or agency of the Company or any of its subsidiaries, or violate the terms of their contract, or any employment consulting or agent agreement, with it.

(c)    It is expressly understood and agreed that although Executive and Company consider the restrictions contained in this Section 9 to be reasonable if a court makes a final judicial determination of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against Executive, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as the court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

(d)    Executive expressly understands that in the event of a violation of any period specified in this Section 9, such period shall be extended by a period of time equal to that period beginning with the commencement of any such violation and ending when such violation shall have been finally terminated in good faith.

10. <u>Enforcement of Covenants</u>. Executive acknowledges that Executive has carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed upon Executive pursuant to <u>Sections 7</u>, <u>8</u> and <u>9</u>, and Executive agrees that these restraints are necessary for the reasonable and proper protection of Company and its successors and assigns and that each and every one of the restraints is reasonable in respect to the subject matter, length of time and geographic area. Executive further acknowledges that, were Executive to breach any of the covenants in <u>Section 7</u>, <u>Section 8</u> and/or <u>Section 9</u> the damage to the Company would be irreparable. Executive therefore agrees that Company, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any breach or threatened breach by Executive of any of the covenants herein, without any requirement to post a bond or similar security. The Parties further agree that in the event that any provision of <u>Section 7</u>, <u>Section 8</u> and/or <u>Section 9</u> shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, such provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.

11. <u>Definitions</u>. Words or phrases that are initially capitalized or within quotation marks shall have the meanings provided in this <u>Section 11</u> and as provided elsewhere. For purposes of this Agreement, the following definitions apply:

(a) **"$"** refers to U.S. Dollars.

(b) **"Affiliate"** means, with respect to any specified Person, any other Person which directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person (for the purposes of this definition, **"control"** (including, with correlative meanings, the terms **"controlling," "controlled by"** and **"under common control with"**), as used with respect to any Person, means the possession, directly or indirectly, of the power to either: (i) direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise, or (ii) vote at least fifty percent (50%) or more of the securities having voting power for the election of a majority of the directors (or Persons performing similar functions) of such Person.

(c) **"Cause"** means if Executive is discharged by Company on account of the occurrence of one or more of the following events:

(i) Executive's continued refusal or failure to perform (other than by reason of Disability) Executive's material duties and responsibilities to Company if such refusal or failure is not cured within thirty (30) days following written notice of such refusal or failure by Company to Executive, or Executive's continued refusal or failure to follow any reasonable lawful direction of the Board if such refusal or failure is not cured within thirty (30) days following written notice of such refusal or failure by Company to Executive;

(ii) willful, grossly negligent or unlawful misconduct by Executive which causes material harm to Company or its reputation;

(iii) the Company is directed in writing by regulatory or governmental authorities to terminate the employment of Executive or Executive engages in activities that: (i) are not approved or authorized by the Board, and (ii) cause actions to be taken by regulatory or governmental authorities that have a material adverse effect on Company; or

(iv) a conviction, plea of guilty, or plea of *nolo contendere* by Executive, of or with respect to a criminal offense which is a felony or other crime involving dishonesty, disloyalty, fraud, embezzlement, theft, or similar action(s) (including, without limitation, acceptance of bribes, kickbacks or self-dealing), or the material breach of Executive's fiduciary duties with respect to Company.

(d) **"Change in Control"** means the occurrence, in a single transaction or in a series of related transactions, of any one or more of the following events:

(i) A transaction or series of transactions (other than an offering of common stock to the general public through a registration statement filed by the Company with the Securities and Exchange Commission) whereby any "Person" or related "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) (other than the Company, any of its subsidiaries, an Executive benefit plan maintained by the Company or any of its subsidiaries or a "Person" that, prior to such transaction, directly or indirectly controls, is controlled by, or is under common control with, the Company) directly or indirectly acquires beneficial ownership (within the meaning of Rule 13(d)(3) under the Exchange Act) of securities of the Company possessing more than fifty percent (50%) of the total combined voting power of the Company's securities outstanding immediately after such acquisition;

(ii) The consummation by the Company (whether directly involving the Company or indirectly involving the Company through one or more intermediaries) of (x) a merger, consolidation, reorganization, or business combination, or (y) a sale or other disposition of all or substantially all of the Company's assets in any single transaction or series of related transactions:

(A) which results in the Company's voting securities outstanding immediately before the transaction continuing to represent (either by remaining outstanding or by being converted into voting securities of the Company or the Person that, as a result of the transaction, controls, directly or indirectly, the Company or owns, directly

or indirectly, all or substantially all of the Company's assets or otherwise succeeds to the business of the Company (the Company or such Person, the **"Successor Entity"**) directly or indirectly, at least a majority of the combined voting power of the Successor Entity's outstanding voting securities immediately after the transaction, and

(B) after which no Person or group beneficially owns voting securities representing fifty percent (50%) or more of the combined voting power of the Successor Entity; _provided_, _however_, that no Person or group shall be treated for purposes of this Section 11(d) as beneficially owning fifty percent (50%) or more of the combined voting power of the Successor Entity solely as a result of the voting power held in the Company prior to the consummation of the transaction.

A transaction shall not constitute a Change in Control if its sole purpose is to change the State of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transaction.

(e) **"Code"** means the Internal Revenue Code of **1986**, as amended.

(f) **"Company"** has the meaning ascribed to it in the preamble of this Agreement.

(g) **"Company Group"** shall mean the Company together with any of its direct or indirect subsidiaries.

(h) **"Compensation Committee"** shall mean the committee of the Board designated to make compensation decisions relating to senior executive officers of the Company.

(i) **"Confidential Information"** means any and all nonpublic information of the Company. Confidential Information includes, without limitation, such information relating to (i) the development, research, testing, manufacturing, marketing, and financial activities of the Company, (ii) the Services, (iii) the costs, sources of supply, financial performance, and strategic and/or business plans of Company, (iv) the identity and special needs of the customers and prospective customers of Company, and (v) the people and organizations with whom Company has business relationships and those relationships. Confidential Information also includes any information that Company has received, or may receive hereafter, belonging to customers or others with any understanding, express or implied, that the information would not be disclosed. Notwithstanding the foregoing, **"Confidential Information"** does not include (x) any information that is or becomes generally known to the industry or the public through no wrongful act of Executive or any representative of Executive and (y) any information that is made legitimately available to Executive by a third Party without breach of any confidentiality obligation.

(j) **"Disability"** means Executive's inability, due to any illness, injury, accident or condition of either a physical or psychological nature, to substantially perform Executive's duties and responsibilities hereunder for a period of one hundred twenty (120) consecutive days, or for any one hundred and eighty (180) days during any period of three hundred and sixty-five (365) consecutive calendar days, exclusive of any leave Executive may take under the Family and Medical Leave Act, 29 U.S.C. § 12101 *et seq.* *(***"FMLA"***)* or as a reasonable accommodation under the Americans with Disabilities Act, 29 U.S.C. § 2601 *et seq.* *(***"ADA"***)*.

(k) **"Final Compensation"** means the amount equal to the sum of: (i) the Base Salary earned but not paid through the date of termination of employment, payable not later than the next scheduled payroll date, (ii) any business and related expenses and allowances incurred by Executive or to which Executive is entitled under Section 4(g) but unreimbursed on the date of termination of employment; *provided* that with respect to business expenses unreimbursed under Section 4(g), such expenses and required substantiation and documentation are submitted within one hundred eighty (180) days of termination in the case of termination on account of Executive's death, or thirty (30) days on account of termination for any reason other than death, and that such expenses are reimbursable under Company's applicable reimbursement policy, and (iii) any other supplemental compensation, insurance, retirement or other benefits due and payable or otherwise required to be provided under Section 4 in accordance with the terms and conditions of the applicable plan or agreement.

(l) **"Good Reason"** means, without Executive's express written consent: (i) a material reduction in the Base Salary, then in effect, except a material diminution generally affecting all of the members of the Company's management, (ii) a material reduction in job title, position or responsibility, (iii) a material breach of any term or condition contained in this Agreement, or (iv) a relocation of Executive's principal worksite that is more than fifty (50) miles from Executive's principal worksite as of the Effective Date. However, none of the foregoing events or conditions will constitute **"Good Reason"** unless (i) Executive provides Company with written notice of the existence of Good Reason within ninety (90) days following the occurrence thereof, (ii) Company does not reverse or otherwise cure the event or condition within thirty (30) days of receiving that written notice, and (iii) Executive resigns Executive's employment within thirty (30) days following the expiration of that cure period.

(m) **"Intellectual Property"** means inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by Executive (whether alone or with others, whether or not during normal business hours or on or off Company premises) during Executive's employment that relate to either the Services or any prospective activity of Company or that make use of Confidential Information or any of the equipment or facilities of Company.

(n) **"Person"** means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust, and any other entity or organization other than Company.

(o) **"Sale of Company"** means the sale of Company to an independent third Party or group of independent third Parties pursuant to which such Party or Parties acquire: (i) equity interests possessing the voting power under normal circumstances to elect a majority of the Board of Directors or similar governing body of Company (whether by merger, consolidation or sale or transfer of such equity interests), or (ii) all or substantially all of Company's assets determined on a consolidated basis.

(p) **"Services"** means all services planned, researched, developed, tested, manufactured, sold, licensed, leased or otherwise distributed or put into use by Company, together with all products provided or planned by Company, during Executive's employment.

(q) **"Severance Period"** shall mean that number of years or partial years following termination of Executive's employment equal to the number of years or partial years of Base Salary that the Executive receives under Section 5(f).

(r) **"Term End Date"** shall mean the last day of the Term of this Employment Agreement.

12. Withholding. All payments made by Company under this Agreement may be reduced by any tax or other amounts required to be withheld by Company under applicable law or by any amounts authorized in writing by Executive.

13. Assignment. Neither Company nor Executive may make any assignment of this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other; *provided*, *however*, that Company may assign its rights and obligations under this Agreement without the consent of Executive in the event of a Sale of Company. This Agreement shall inure to the benefit of and be binding upon Company and Executive, their respective successors, executors, administrators, heirs and permitted assigns.

14. Compliance with Code Section 409A.

(a) Notwithstanding any provision of this Agreement to the contrary, Executive's employment will be deemed to have terminated on the date of Executive "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) with Company.

(b) It is intended that this Agreement will comply with Section 409A of the Code, and any regulations and guideline issued thereunder (**"Section 409A"**) to the extent that any compensation and benefits provided hereunder constitute deferred compensation subject to Section 409A. This Agreement shall be interpreted on a basis consistent with this intent. The Parties will negotiate in good faith to amend this Agreement as necessary to comply with Section 409A in a manner that preserves the original intent of the Parties to the extent reasonably possible. No action or failure to act, pursuant to this Section 14 shall subject Company to any claim, liability, or expense, and Company shall not have any obligation to indemnify or otherwise protect Executive from the obligation to pay any taxes pursuant to Section 409A of the Code.

(c) For purposes of the application of Treas. Reg. § 1.409A-1(b)(4)(or any successor provision), each payment in a series of payments will be deemed a separate payment.

(d) Notwithstanding anything in this Agreement to the contrary, if any amount or benefit that would constitute non-exempt "**deferred compensation**" for purposes of Section 409A of the Code would otherwise be payable or distributable under this Agreement by reason of Executive's separation from service during a period in which Executive is a "**specified Executive**" (as defined under Code Section 409A and the final regulations thereunder), then, subject to any permissible acceleration of payment by Company under Treas. Reg. Section 1.409A-3(j)(4)(ii) (domestic relations order), (j)(4)(iii) (conflicts of interest), or (j)(4)(vi) (payment of employment taxes):

(i) if the payment or distribution is payable in a lump sum, the Executive's right to receive payment or distribution of such non-exempt deferred compensation will be delayed until the earlier of Executive's death or the first day of the seventh month following Executive's separation from service; and

(ii) if the payment or distribution is payable over time, the amount of such non-exempt deferred compensation that would otherwise be payable during the six months immediately following Executive's separation from service will be accumulated, and the Executive's right to receive payment or distribution of such accumulated amount will be delayed until the earlier of Executive's death or the first day of the seventh month following Executive's separation from service, whereupon the accumulated amount will be paid or distributed to Executive and the normal payment or distribution schedule for any remaining payments or distributions will resume.

This Section 14(d) should not be construed to prevent the application of Treas. Reg § 1.409A-1(b)(9)(iii)(or any successor provision) to amounts payable hereunder (or any portion thereof).

15. Golden Parachute Limitation. Notwithstanding anything in this Section or elsewhere in this Agreement to the contrary, in the event the payments and benefits payable hereunder to or on behalf of Executive (which the Parties agree will not include any portion of payments allocated to the non-competition and non-solicitation provisions of Section 9) that are classified as payments of reasonable compensation for purposes of Section 280G of the Code, when added to all other amounts and benefits payable to or on behalf of Executive, would result in the loss of a deduction under Code Section 280G, or the imposition of an excise tax under Code Section 4999, the amounts and benefits payable hereunder shall be reduced to such extent as may be necessary to avoid such loss of deduction or imposition of excise tax. In applying this principle, the reduction shall be made in a manner consistent with the requirements of Code Section 409A and where two or more economically equivalent amounts are subject to reduction, but payable at different times, such amounts shall be reduced on a *pro-rata* basis. All calculations required to be made under this subsection will be made by the Company's independent public accountants, subject to the right of Executive's professional advisors to review the same. The Parties recognize that the actual implementation of the provisions of this subsection are complex and agree to deal with each other in good faith to resolve any questions or disagreements arising hereunder.

16. Successors.

(a) Company's Successors. Subject to Section 5(f), any successor to the Company (whether direct or indirect and whether by purchase, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets shall assume the obligations under this Agreement and agree expressly to perform the obligations under this Agreement in the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under this Agreement, the term "Company" shall include any successor to the Company's business and/or assets which executes and delivers the assumption agreement described in this Section 16 or which becomes bound by the terms of this Agreement by operation of law.

(b) Executive's Successors. The terms of this Agreement and all rights of Executive hereunder shall inure to the benefit of, and be enforceable by, Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees

17. <u>Clawback Provisions</u>. Any amounts payable under this Agreement are subject to any policy (whether in existence as of the Effective Date or later adopted) established by the Company providing for clawback or recovery of amounts that were paid to the Executive. The Company will make any determination for clawback or recovery in its sole discretion and in accordance with any applicable law or regulation.

18. <u>Indemnification</u>. Company will indemnify Executive to the fullest extent permitted by law, for all amounts (including, without limitation, judgments, fines, settlement payments, expenses and reasonable out-of-pocket attorneys' fees) incurred or paid by Executive in connection with any action, suit, investigation or proceeding, or threatened action, suit, investigation or proceeding, arising out of or relating to the performance by Executive of services for, or the acting by Executive as a director, officer or Executive of, Company, or any subsidiary of Company. Any fees or other necessary expenses incurred by Executive in defending any such action, suit, investigation or proceeding shall be paid by Company in advance, subject to Company's right to seek repayment from Executive if a determination is made that Executive was not entitled to indemnification.

19. <u>Severability</u>. If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in the circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

20. <u>Waiver</u>. No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving Party. The failure of either Party to require the performance of any term or obligation of this Agreement, or the waiver by either Party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

21. <u>Survival</u>. <u>Section 6</u> through and including <u>Section 32</u> shall survive and continue in full force in accordance with their terms notwithstanding the termination of Executive's employment (and hence the Term of this Agreement) for any reason.

22. <u>Notices</u>. Any and all notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered in Person, with respect to notices delivered personally, or upon confirmed receipt when delivered by facsimile or deposited with a reputable, nationally recognized overnight courier service and addressed or faxed to Executive at Executive's last known address on the books of Company or, in the case of Company, at its principal place of business, attention: Secretary, Board of Directors.

23. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the Parties (including with respect to Company, its successors and assigns) with respect to Executive's employment and supersedes all prior communications, agreements and understandings, written or oral, with respect to the terms and conditions of Executive's employment.

24. <u>Amendment</u>. This Agreement may be amended or modified only by a written instrument signed by Executive and by an expressly authorized representative of Company.

25. <u>Headings</u>. The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement.

26. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument. Furthermore, the delivery of a copy of such signature by facsimile transmission or other electronic exchange methodology shall constitute a valid and binding execution and delivery of this Agreement by such Party, and such electronic copy shall constitute an enforceable original document. Counterpart signatures need not be on the same page and shall be deemed effective upon receipt.

27. <u>Additional Obligations</u>. Without implication that the contrary would otherwise be true, Executive's obligations under <u>Section 7</u>, <u>Section 8</u> and <u>Section 9</u> are in addition to, and not in limitation of, any obligations that Executive may have under applicable law (including any law regarding trade secrets, duty of loyalty, fiduciary duty, unfair competition, unjust enrichment, slander, libel, conversion, misappropriation and fraud).

28. <u>Attorneys' Fees</u>. In any action or proceeding brought to enforce any provision of this Agreement, the prevailing Party shall be entitled to recover reasonable attorneys' fees, costs, and expenses from the other Party to the action or proceeding. For purposes of this Agreement, the **"prevailing Party"** shall be deemed to be that Party who obtains substantially the result sought, whether by settlement, mediation, judgment or otherwise, and **"attorneys' fees"** shall include, without limitation, the reasonable out-of-pocket attorneys' fees incurred in retaining counsel for advice, negotiations, suit, appeal or other legal proceeding, including mediation and arbitration.

29. <u>Confidentiality</u>. The Parties acknowledge and agree that this Agreement and each of its provisions are and shall be treated strictly confidential. During the Term and thereafter, Executive shall not disclose any terms of this Agreement to any Person or entity without the prior written consent of Company, with the exception of Executive's tax, legal or accounting advisors or for legitimate business purposes of Executive, or as otherwise required by law.

30. <u>No Rule of Construction</u>. This Agreement shall be construed to be neither against nor in favor of any Party hereto based upon any Party's role in drafting this Agreement, but rather in accordance with the fair meaning hereof.

31. <u>Governing Law</u>. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the state of Texas.

32. <u>WAIVER OF JURY TRIAL</u>. EXECUTIVE AND THE COMPANY EXPRESSLY WAIVE ANY RIGHT EITHER MAY HAVE TO A JURY TRIAL CONCERNING ANY CIVIL ACTION THAT MAY ARISE FROM THIS AGREEMENT OR THE RELATIONSHIP OF THE PARTIES HERETO.

33. <u>Conditions</u>. This Agreement and the Executive's continued employment hereunder is conditional on the Company's satisfaction (determined in the Company's sole discretion) that the Executive has met the legal requirements to perform the Executive's role, including but not limited to satisfactory results of a background and/or credit search or any other applicable security clearance checks and criminal record checks and other reference checks that the Company performs. The Executive acknowledges and agrees that in signing this Agreement, and providing the Company with the necessary documentation to perform the checks required for the Executive's role and with references, the Executive is providing consent to the Company or its agent, to performs such checks and contact the references the Executive provided to the Company.

34. <u>Prior Restrictions</u>. By signing below, the Executive represents that the Executive is not bound by the terms of any agreement with any Person which restricts in any way the Executive's hiring by the Company and the performance of the Executive's expected job duties; the Executive also represents that, during the Executive's employment with the Company, the Executive shall not disclose or make use of any confidential information of any other persons or entities in violation of any of their applicable policies or agreements and/or applicable law.

35. <u>Independent Legal Counsel</u>. By signing below, the Executive hereby acknowledges that the Executive has been encouraged to obtain independent legal advice regarding the execution of this Agreement, and that the Executive has either obtained such advice or voluntarily chosen not to do so, and hereby waives any objections or claims the Executive may make resulting from any failure on the Executive's part to obtain such advice.

36. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original when executed, but all of which taken together shall constitute the same Agreement. Delivery of an executed counterpart of a signature page to this Agreement by electronic transmission, including in portable document format (.pdf), shall be deemed as effective as delivery of an original executed counterpart of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, this Agreement has been executed by Company (by its duly authorized representative) and by Executive, as of the date first above written.

**CALLAN JMB INC.**

By:     */s/ Wayne Williams*

Name:    Wayne Williams

Title:     Chief Executive Officer and President

**EXECUTIVE**:

*/s/ Jeffrey Appleman*

Jeffrey Appleman

EXHIBIT A

Release of Claims

FOR AND IN CONSIDERATION OF the benefits to be provided me in connection with the termination of my employment, as set forth in that certain Employment Agreement, dated as of October 1, 2024 (the **"Agreement"**), between me and Callan JMB Inc. (the **"Company"**), or under any severance pay plan applicable to me, which benefits are conditioned on my signing this Release of Claims and to which I am not otherwise entitled, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I, on my own behalf and on behalf of my heirs, executors, administrators, beneficiaries, representatives and assigns, and all others connected with me, hereby release and forever discharge Company and any of its subsidiaries and Affiliates (as that term is defined in Section 11(b) of the Agreement) and all of their respective past, present and future officers, directors, trustees, equity holders, executives, agents, managers, joint venturers, representatives, successors and assigns, and all others connected with any of them (collectively, the **"Released Parties"**), both individually and in their official capacities, from any and all causes of action, rights and claims of any type or description, known or unknown, which I have had in the past, now have, or might now have, through the date of my signing of this Release of Claims, in any way resulting from, arising out of or connected with my employment by the Company or any of its Affiliates or the termination of that employment, including, but not limited to, any allegation, claim or violation arising under: Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended (including the Older Worker Benefit Protection Act); the Equal Pay Act of 1963, as amended; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Worker Adjustment Retraining and Notification Act; Executive Retirement Income Security Act of 1974; the Fair Labor Standards Act; any applicable Executive Orders; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other federal, state or local law, regulation or ordinance; or under any public policy, contract or tort, or under common law; or arising under any policies, practices or procedures of the Company; or any claim for wrongful discharge, breach of contract, intentional infliction of emotional distress or defamation; or any claim for costs, fees or other expenses, including attorneys' fees incurred in these matters (all of the foregoing collectively referred to herein as **"Claims"**), other than (i) the right to payment of any vested or accrued benefits under any supplemental compensation, insurance, retirement and/or other benefit plan or agreement applicable to Executive, (ii) the right to payment of any amounts owed to me by Company pursuant to Section 5 of the Agreement, (iii) any rights under applicable workers compensation or unemployment compensation laws, (iv) any rights that survive termination of my employment pursuant to an restricted stock units/options grant agreement or certificate to purchase the Company's (or an Affiliate's) capital stock, (v) any rights with respect to the Company's (or an Affiliate's) capital stock owned by Executive, or (vi) any rights to indemnification under the Agreement, the Company's by-laws or any other applicable law.

In signing this Release of Claims, I acknowledge my understanding that I may not sign it prior to the termination of my employment, but that I may consider the terms of this Release of Claims for up to twenty-one (21) days (or such longer period as the Company may specify) from the later of the date my employment with the Company terminates or the date I receive this Release of Claims. I also acknowledge that I am advised by the Company and its Affiliates to seek the advice of an attorney prior to signing this Release of Claims; that I have had sufficient time to consider this Release of Claims and to consult with an attorney, if I wished to do so, or to consult with any other Person of my choosing before signing; and that I am signing this Release of Claims voluntarily and with a full understanding of its terms.

I represent that I have not filed against the Released Parties any complaints, charges, or lawsuits arising out of my employment, or any other matter arising on or prior to the date of this Release of Claims, and covenant and agree that I will never individually or with any Person file, or commence the filing of, any charges, lawsuits, complaints or proceedings with any governmental agency, or against the Released Parties with respect to any of the matters released by me pursuant to this Release of Claims.

I further acknowledge that, in signing this Release of Claims, I have not relied on any promises or representations, express or implied, that are not set forth expressly in the Agreement. I understand that I may revoke this Release of Claims at any time within seven (7) days of the date of my signing by written notice to the Secretary, Board of Directors of the Company (or such other Person as the Company may specify by notice to me given in accordance with the Agreement) and that this Release of Claims will take effect only upon the expiration of such seven-day revocation period and only if I have not timely revoked it.

Intending to be legally bound, I have signed this Release of Claims as of the date written below.

Signature:

Name:

_____

Date
Signed:

_____

_____

## AMENDMENT TO THE EMPLOYMENT AGREEMENT

This Amendment ("**Amendment**") to the Employment Agreement dated October 1, 2024 (the "**Agreement**"), is made and entered into as of October 24, 2024, by and between Callan JMB Inc., a Nevada corporation (the "**Company**"), and Jeff Appleman, an individual ("**Executive**"). Each of the Company and Executive is a "Party" to this Amendment and the Company and Executive, collectively, the "**Parties**" hereto.

## RECITALS

**WHEREAS**, the Company and the Executive desire to amend the Agreement to revise certain terms, conditions and obligations of the Parties with respect to the Executive's employment in the Company.

**NOW, THEREFORE**, for and in consideration of the promises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree to amend the Agreement as follows:

1. Section 2 of the Agreement is hereby deleted in its entirety, and in its place the following is inserted:

Term. The Executive's employment contract hereunder shall be effective from the date hereof, and shall continue for two year after the 1st Day of the Initial Public Offering of the Company (the "**Initial Term**"), unless terminated earlier pursuant to the terms of this Agreement; *provided that*, on expiry of such Initial Term, the Agreement shall be deemed to be automatically extended, upon the same terms and conditions, for successive periods of one (1) years (each "**Renewal Term**"), unless either Party provides written notice of its intention not to extend the term of the Agreement at least 90 days prior to the applicable renewal date. The Initial Term and each Renewal Term are hereinafter referred to as the "**Term**."

2. Section 4(a) of the Agreement is hereby deleted in its entirety, and in its place the following is inserted:

(a) Base Salary. For services performed by Executive under this Agreement, Company shall pay Executive an annual base salary of $220,000 from the 1st Day of the Initial Term, through December 31, 2025, $250,000 from January 1, 2026 through December 31, 2026, and $280,000 from January 1, 2027 through December 31, 2027, minus applicable withholdings and deductions, payable at the same times as salaries are payable to other executives of Company (the "**Base Salary**"). During the Term, the Base Salary

shall be reviewed by the Compensation Committee and/or the Board each year, and the Board may, from time to time, increase such Base Salary and any reference to "**Base Salary**" herein shall refer to such Base Salary, as increased.

3.     <u>Section 4(c)</u> of the Agreement is hereby deleted in its entirety, and in its place the following is inserted:

      (c) <u>Equity Awards</u>. During the Term, the Executive shall be entitled to receive equity awards either now or in the future, on terms and conditions similar to those applicable to other executive officers of the Company generally, inside or outside of any established equity plan. The amount and terms of the long-term incentive awards awarded to the Executive shall be set by the Compensation Committee in its discretion. In addition, on the 1st day of the Initial Public Offering of the Company, the Executive shall be awarded an additional 100,000 stock options (the "**Options**") with an exercise price equal to the price of the Company's common stock as set forth in the final Registration Statement for the Offering, vesting quarterly (every 3 months) over twenty-four (24) months with the first installment vesting three (3) months after the closing of the Company's currently contemplated firm commitment underwritten public offering (the "**Offering**") pursuant to a registration statement on Form S-1 (the "**Registration Statement**"). The Options shall be governed by and subject to the Company's employee stock option plan in place from time to time.

4.     Except as set forth above, all of the terms, conditions and provisions of the Agreement shall be and remain in full force and effect. Capitalized terms used but not defined herein shall have the meanings given to them in the Agreement. This Amendment shall be effective on the date set forth above.

**[SIGNATURE PAGE TO THE AMENDMENT FOLLOWS]**

**IN WITNESS WHEREOF,** the Parties hereto have caused this Amendment to be executed on the date first written above.

**"COMPANY"**

**CALLAN JMB INC.**

*/s/ Wayne Williams*

_____

Wayne Williams
Chief Executive Officer and President

**"EXECUTIVE"**

*/s/ Jeffrey Appleman*

_____

Jeffrey Appleman